## GRIGSBY v. COMMISSIONER OF INTERNAL REVENUE.
### No. 5890.

Circuit Court of Appeals, Seventh Circuit.
Jan. 8, 1937.

Isaac B. Lipson, E. H. McDermott, and William M. Emery, all of Chicago, Ill., for petitioner.

Robert H. Jackson, Asst. Atty. Gen., and J. Louis Monarch, Berryman Green, and Harry Marselli, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

SPARKS, Circuit Judge.

This petition for review of a decision of the Board of Tax Appeals raises the question whether the loss resulting from being compelled to take up the stock which was the subject of an underwriting agreement and which was worth less at the date of delivery than petitioner was required by the terms of the agreement to pay for it, is deductible from gross income in the year of the transaction. The Board of Tax Appeals held that the transaction constituted a mere sale of the stock to petitioner, hence no deductible loss was sustained at its acquisition in 1929, the year for which the deduction was sought.

Petitioner was the president of the Grigsby-Grunow Company. In 1929, that company determined, by resolution of its Board of Directors, to embark upon a program of expansion for which it required about $9,000,000 new capital. In order to obtain this new capital, the Board decided to offer for sale 249,737 shares of stock of the company then authorized but unissued. The offer was to be made first to the then stockholders, and on October 16, 1929, notice was given to them of the warrants to be issued, and the expansion plan decided upon. In order to avoid delay, it was considered desirable to have the sale underwritten by responsible parties. Hence, on October 14, 1929, an underwriting agreement was entered into between the Board of Directors and a firm of investment bankers, John Burnham and Company, whereby the latter agreed to buy any of the 249,737 shares which were not purchased by the holders of stock subscription warrants at $40 a share by November 15. The date for settlement was subsequently extended to November 25. In return, the company was to pay the underwriter a commission of $4 a share for its services in the underwriting, or a total of $998,948. On October 15, Burnham and Company offered petitioner the opportunity to participate in a syndicate of which they were to be managers, for the purpose of underwriting the stock sale. Petitioner was allotted 18,730 shares as his part in the syndicate, participation in which he duly accepted.

During the week ending October 18, when the underwriting agreement was entered into, and the syndicate of which petitioner was a member was formed, the stock of the Grigsby-Grunow Company ranged in price from $59 to $66 a share on the market. Thereafter it began to decline, closing at 30½ on October 28. During the period within which the subscription warrants could be exercised, it ranged from 34⅞ to 14¼ a share. On November 25, the settlement date, Burnham and Company notified petitioner that he would have to take up the entire allotment of 18,730 shares, requesting him to accept delivery from, and make payment to, the Grigsby-Grunow Company. Petitioner then delivered his check for $749,200, receiving in

return the shares, and the check of that company for $74,920, to cover the $4 per share commission to which he was entitled under the terms of the underwriting agreement. It was stipulated that the fair market value of the stock on November 25, was $18.50 a share. Petitioner did not dispose of the stock until after the year 1929, selling most of it in 1933 for around $1 a share. In computing his losses on the 1933 sales, he used $18.50 as the cost basis. In filing his return for the year 1929, he deducted from his gross income the item of $327,775, the difference between the $40 a share he was compelled to pay for the stock, and the $18.50 it was actually worth at the date of delivery, less the $4 a share he received back as a commission on the transaction. The Commissioner assessed a deficiency as to this item, and the Board of Tax Appeals sustained the assessment, holding that since the disputed transaction was a mere sale of the stock to petitioner, no deductible loss was sustained on its acquisition, but that that must be deferred until its later admitted sale.

Petitioner's principal argument in support of his claim to the deduction is that the syndicate agreement created an association which amounted to a separate entity within the definition of "corporation," and that the transaction which arose out of it was completely closed within the taxable year, hence the resultant loss was realized within the year. It is conceded that the transaction was "a transaction entered into for profit."

Petitioner labors to distinguish between the effect of an ordinary sale where the parties intend by their contract that the vendee shall become the purchaser of the subject matter of the sale, whatever it may be, and an underwriting transaction as here where it was intended that the profit should arise from the commission on the sale to other parties, and it was not contemplated that the parties would be compelled to become the purchasers of the stock, the sale of which they guaranteed. He cites section 701(a) (2) of the Revenue Act of 1928, 45 Stat. 791, 878 (26 U.S.C. A. § 1696(3)); Regulations 74, Articles 1312, 1313, and 1314, and a line of cases, all of which have to do with the taxability of associations which are to be treated as corporations.[1] Relying on these authorities, he argues that section 115(c) of the act (26 U.S.C.A. § 115 note) providing that amounts distributed in liquidation of a corporation shall be treated as in full payment in exchange for the stock, is applicable to determine that the syndicate can be considered as a corporation, and that the winding up of it by distribution of the stock constituted a completed transaction, the loss from which is to be computed according to sections 111 and 113 of the act (26 U.S.C.A. §§ 111 and note, 113 note), as the excess of the cost basis over the amount realized.

We can not agree with this line of reasoning. An underwriting agreement of the type here involved means simply that if others don't buy, the underwriter will. That the purchase is a forced one does not make it any the less a purchase, nor does the fact that participation in the agreement was, so to speak, sub-let, change the result. The fact remains that petitioner and others participated in the agreement originally entered into by the Burnham Company, sharing pro rata the privileges and obligations arising out of it. The privilege was the right to collect the $4 a share commission on all shares involved; the obligation was to take any shares not otherwise disposed of. Taking those shares constituted a purchase, regardless of the fact that it was not originally contemplated that the necessity for so doing would arise. Since the shares were not disposed of during the taxable year, no loss was sustained.

Petitioner quotes from the case, United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, to the effect that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment, provided that that loss is fixed by some identifiable event. As examples of such events, the Court cites sale of property or its physical destruction, or, in the case of bad debts, the occurrence of such events as prevent their collection. We think petitioner may not isolate the carrying out of the underwriting agreement here and fix

---

[1] Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263; Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278.

it as the identifiable event by which his loss may be determined, while still holding the stock delivered to him under the agreement.

Petitioner also relies upon the decision of the Board of Tax Appeals in the case of Albert Erskine v. Com'r, 26 B.T.A. 147. That case, however, held simply that a contract between an employer and its employee, permitting the latter to purchase from the former a certain number of shares of the stock of the employer for a nominal sum, which shares the employer purchased on the open market for a much larger amount, constituted a contract of employment and compensation therefor, which compensation was taxable, at a rate determined by the difference between the market value of the stock and the price to the taxpayer. While that may be used in support of the proposition that every contract that involves a purchase and sale of stocks is not necessarily to be construed primarily as such for taxing purposes, it does not support the proposition that every contract of purchase and sale which involves another element must be construed in accordance with the other element rather than as a contract of purchase and sale. The Board of Tax Appeals held in the Erskine Case that the contract there involved was primarily an employment contract; in the case at bar it held that the contract was primarily one for purchase and sale.

The Board also placed its decision on another ground, the correctness of which petitioner challenges, namely, that he had not proved that the syndicate was a separate entity, and that in fact, he as a member of it was contracting as a principal with the Grigsby-Grunow Company, with Burnham and Company acting as his agents. There is evidence in the record supporting this theory. However, we do not consider it necessary to pass on this point, since we are convinced that even though the syndicate may have been a separate association, the termination of its activities by execution of all contract obligations by both parties, did not constitute such a closed transaction as to render losses deductible prior to the disposition of the stocks.

Decision affirmed.