### COMMISSIONER OF INTERNAL REVENUE v. LYON.
### No. 8521.

Circuit Court of Appeals, Ninth Circuit.
May 27, 1938.

James W. Morris, Asst. Atty. Gen., Sewall Key, Jos. M. Jones, John G. Remey, M. Leo Looney, Jr., and Norman D. Keller, Sp. Assts. to Atty. Gen., for petitioner and cross-respondent.

Joseph D. Brady, of Los Angeles, Cal. (Russ Avery, of Los Angeles, Cal., of counsel), for respondent and cross-petitioner.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The case is before this court upon a petition and upon a cross-petition for review of a decision of the Board of Tax Appeals involving income taxes for 1929. The petition is brought by the Commissioner of Internal Revenue and the cross petition is brought by the administrator of the estate of Homer Laughlin, Jr., deceased. Since the petition and the cross petition involve two distinct items of the decision, we shall consider them separately.

The Commissioner's Petition.

The Commissioner petitions for a review of the decision of the Board holding that a sum of $75,000 reported by taxpayer in his return for 1929 did not constitute income to the decedent in that year.

On October 29, 1919, decedent and his sister were owners in equal shares of real property situate in Los Angeles. On said date decedent and his sister, as lessors, and Grand Central Public Market, Inc., a corporation, as lessee, entered into a written lease of a part of the premises for the period commencing November 1, 1919, and ending October 31, 1929. The Board found that, "As part consideration for the lease Grand Central made a cash payment in 1919 of $75,000., one-half to decedent and one-half to his sister. The total rental provided for in the lease for the full ten-year term was $870,000 payable in monthly installments of $7,000 in advance on the first day of each month during the first five years and $7,500 in advance on the first day of each month of the last five years. The lease provided that the total rental for the term was inclusive of the above mentioned $75,000 and that the provision for monthly payments was subject to the application of said amount as provided therein."

The lease further provides as follows:

"2. Deposit: It is understood that the aforementioned sum of Seventy-five Thousand Dollars ($75,000.00) has been paid in equal halves to the said lessors severally, that is to say, Thirty-seven Thousand Five Hundred Dollars ($37,500.00) to Homer Laughlin, Jr., and Thirty-seven Thousand Five Hundred Dollars ($37,500.00) to Guendolin V. Laughlin, and each of them does hereby acknowledge the receipt of the said sum of Thirty-seven Thousand Five Hundred Dollars ($37,500.00), and the said lessors each for himself or herself, severally, and not jointly, does hereby covenant and agree to pay to the lessee, (by giving credit upon the rents accruing hereunder, as hereinafter provided, so long as cash payment of rents shall accrue hereunder, and thereafter in cash) interest at the rate of six per cent per annum upon the said respective sums of Thirty-seven Thousand Five Hundred Dollars ($37,500.00) paid to each of them, or so much thereof as shall remain unapplied on rentals as hereinafter provided, from the date hereof until the whole of said respective sums of Thirty-seven Thousand Five Hundred Dollars ($37,500.00) shall have been applied on rentals, or repaid to the lessee or forfeited, as hereinafter provided. It is understood and agreed, however, anything herein contained to the contrary notwithstanding, that the said lessee shall have the right to deduct and retain from the installments of rent falling due on the first days of May and November in each year the full amount of interest then due from either of the lessors under the provisions of this paragraph.

"It is further understood and agreed that if the said lessee shall have fully and faithfully performed all the covenants and agreements on its part herein contained one tenth of the said sum of Seventy-five Thousand Dollars ($75,000.00) shall on the first day of each of the last ten months of said term, be applied and credited in payment of the rent of said premises for that month.

"It is further covenanted and agreed that in the event of the termination of this lease, otherwise than by the default of the lessee, before the whole of the said sum of Seventy-five Thousand Dollars ($75,000.00) shall have been applied as hereinabove provided, the said lessors severally and respectively covenant and agree that they will repay to said lessee the said respective sums of Thirty-seven Thousand Five Hundred Dollars ($37,500.00) received by each of them or so much thereof as shall not then have been applied on rents as herein provided, together with interest as hereinbefore provided.

"It is further understood and agreed that if the said lessee shall not fully and faithfully perform all of the covenants and agreements on its part herein contained, and, by reason of such default, this lease should be terminated, the said respective sums so paid to the said lessors shall belong to them respectively, as part of the consideration to them for the execution of this

lease, and as liquidated damages and full compensation for any detriment caused them by the breach of the provisions hereof by the lessee.

\* \* \* \* \* \*

"6. Termination for Default:

\* \* \* \* \* \*

"In the event the lessors at their option hereinabove given terminate this lease by reason of any default on the part of the lessee and forfeit the right of the lessee hereunder for any of the causes for which the lessors may do so, the lessee shall be relieved from payment of any and all installments of rent payable hereunder, except rentals already accrued at the time of the exercise of such option, provided, however, that the lessors shall retain, as liquidated damages, and in lieu of the right to collect from the lessee any further or additional rental for the unexpired portion of the term, or any damages or compensation on account of any breach by the lessee of the terms of this lease, the aforesaid sum of Seventy-five Thousand Dollars. ($75,000.00) paid at the time of the execution of this lease, or so much thereof as shall not then have been applied on rents as herein provided, and the lessee shall forfeit all right, either in law or equity, to the return of the same, it being understood that the lessors in consideration of this agreement, covenant and agree that they will accept the forfeiture of said sum in full satisfaction of any claim or claims against the lessee, and will not claim or demand any further damages or compensation by reason of such breach."

In 1921 the decedent acquired the interest of his sister in the leased property and thereafter carried out all of the terms of the lease entered into by him and her with Grand Central on October 29, 1919. It does not appear that prior to December 31, 1921, the decedent kept any books, but double entry books of account were opened as of December 31, 1921. From January 1, 1922, to December 27, 1932, inclusive, the books and accounts of decedent were kept and his income tax returns were filed on the accrual basis. The $75,000 here involved was included in a liability account—"Tenants Future Rents—Deposits" when the books were set up and was thus continued on the books until January 1, 1929, at which time the decedent began crediting this sum to income as rental at the rate of $7,500 a month, so that at October 31; 1929, the entire amount was reported in taxable income by the decedent in his income tax return for the year 1929. In determining the deficiency for 1929, the Commissioner did not change the amount of $75,000 thus reported as taxable income by decedent.

Before the Board the taxpayer contended that despite his return of the $75,000 as income in 1929 that no part thereof was income in that year. The basis of this contention was that said sum was taxable income in 1919, the year in which it was received; that being taxable income in that year it was subject to tax in that year alone. The argument is that the $75,000 was gross income in 1919 under the provisions of Section 213 of the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1065, 1066;[1] that neither under Section 214[2] nor under any other provision of the same Act was there authority allowing for its deduction in the computation of the net income for 1919, and that the sum was thus of necessity a part of taxable income for that year.[3] The Commissioner concedes[4] that if the $75,000 was gross income in the year in which it was received that it was taxable in that year alone, but he argues that the item in question did not and could not, under the provisions of the lease, become the property of the decedent until 1929, prior to which time it was a "deposit". Com-

---

[1] "Sec. 213. That for the purposes of this title \* \* \* the term 'gross income'—

"(a) [1] Includes gains, profits, and income derived from \* \* \* interest, rent, dividends \* \* \* or gains or profits and income derived from any source whatever.

"(a) [2] The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period \* \* \*".

[2] "Sec. 214(a) That in computing net income there shall be allowed as deductions: \* \* \*".

[3] Revenue Act of 1918, c. 18, 40 Stat. 1057, 1064: "Sec. 212(a) That in the case of an individual the term 'net income' means the gross income as defined in section 213, less the deductions allowed by section \* \* \*."

[4] The parties are also in agreement that on the facts here involved it matters not whether the accounts were kept on a cash or on an accrual basis.

missioner asserts in his brief that to "resolve the question it must be determined whether he [the lessor] had an unfettered right to it, whether he had fully earned it in that year or in 1929". This position is squarely met by the taxpayer with the assertion that since the sum was received by the lessors "without restriction as to its disposition" it was gross income.

In our determination of the question thus presented we have not regarded as important the manner in which the sum was entered upon the books of decedent, both because no books were set up until December 31, 1921, and because the Commissioner makes no point of this fact.

█ █  There seems no room for doubt but that where under the terms of a lease a sum is paid on the execution thereof entirely without restriction as to its disposition it is taxable in the year of its receipt. Renwick et al., Trustees, v. United States, 7 Cir., 1936, 87 F.2d 123, 124. As said in North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197: "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

The same principle is reiterated in Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725, where the sum in question was made up of overriding commissions received by a general agent for a fire insurance company, a portion of each of which commissions was returnable in case of policy cancellation. Mr. Justice Brandeis, speaking for the Court, as he did in North American Oil Consol. v. Burnet, supra, said: "When received, the general agent's right to it [the commission] was absolute. It was under no restriction, contractual or otherwise, as to its disposition, use, or enjoyment." 291 U.S. page 199, 54 S.Ct. page 359.

A consideration of the relevant provisions of the lease here involved convinces us that the $75,000 paid to the taxpayer in 1919 was taxable income to him in that year.

█  If certain lease covenants are examined separately and detached they give rise to conflicting inferences as to the character with which the parties intended to impress the payment. For example, the paragraph

providing that if the lessee should default and a termination of the lease result thereby that the "sums so paid to the said lessors shall belong to them respectively, as part of the consideration to them for the execution of this lease, and as liquidated damages and full compensation for any detriment caused them by the breach of the provisions thereof by the lessee," is cast in the form of a condition precedent and might be taken to indicate that it was the intention of the parties that the payment should not become the property of the lessor's until 1929 when it was to be credited on rent. On the other hand, the paragraph immediately preceding that just considered unquestionably impresses the $75,000 with the character of an absolute payment repayable by the lessor only on the happening of a condition —termination of the lease otherwise than by default of the lessee. In view of the presumption that all contracts will be observed and will not be broken Wells v. Savannah, 181 U.S. 531, 21 S.Ct. 697, 45 L.Ed. 986; Central Trust Company v. Chicago Aud. Ass'n, 240 U.S. 581, 591, 36 S.Ct. 412, 60 L.Ed. 811 such a provision of the lease does not prevent the consideration of the payment as income in the year in which it is received. U. S. v. Boston & Providence R. R. Corporation, 1 Cir., 1930, 37 F.2d 670.

█ █  But in order to arrive at a conclusion with respect to the true intent of the parties, the lease must be examined as a whole. What does such an inclusive examination reveal as to the real intent of the parties? It reveals that the total rental for the ten year term was $870,000 *inclusive* of the $75,000 and that the $75,000 was paid to the lessors as rental without the slightest restriction upon its use. It is provided by the terms of the lease that no part of the $870,000 would be earned should lessee be deprived of the use of the premises and that since the $75,000 was in lieu of monthly installments falling due at the end of the lease term it would never be earned if the term were cut off before such installments fell due. In such case lessors would simply owe lessees the sum overpaid.

Commissioner in urging us to reverse the Board's determination upon this point has relied upon the fact that under the terms of the lease, lessor was required to pay "interest" upon the $75,000. He argues that: "One does not pay interest to another on one's own money. It is paid for the use of money of another".

The lease provided that the payment of "interest" would be accomplished "by giving credit upon the rents accruing thereunder as hereinafter provided, so long as cash payment of rents shall accrue hereunder, and thereafter in cash." It appears from a subsequent clause of the lease that the amounts due as "interest" were to be deducted from the installments of rent falling due on the first days of May and November in each year. It is to be noted that the "interest" could become payable in cash only in the event that the lease should be terminated otherwise than by the default of the lessee. In these circumstances we agree with the Board's conclusion that the "interest" provision was nothing more than a measuring stick adopted by the parties for the purpose of determining how much less than the total rental of $870,000 the adjusted rental should be in order to compensate for the fact that the lessee paid $75,000 ten years in advance.

Accordingly the decision of the Board is sustained on the Commissioner's petition for review. See the admirable and exhaustive opinion in Grand Central Public Market v. U. S., D.C., 22 F.Supp. 119.

### Taxpayer's Petition.

The taxpayer petitions for a review of the decision of the Board that a sum of $75,000 received by him in 1929 was income in that year rather than in 1922.

On December 13, 1922, the decedent as the sole owner of the premises covered by the lease of October 29, 1919 [discussed above] entered into a written lease on the same premises with the Grand Central Public Market for a further term of ten years beginning November 1, 1929, and ending on October 31, 1939. This lease provided in part as follows:

"As a bonus to the Lessor [the decedent] and a consideration for making this lease, the Lessee [Grand Central] has paid to the Lessor the sum of Nineteen Thousand Dollars ($19,000) on the date when this lease is executed, the receipt whereof is hereby acknowledged by the Lessor. As a further bonus to the Lessor and a further consideration to the Lessor for the making of this lease, the Lessee hereby agrees to pay to the Lessor the further sum of Twenty-six Thousand Dollars ($26,000) in lawful money of the United States, in ten monthly installments of Twenty-six Hundred Dollars ($2600) each, payable one each month for ten months from the date hereof, all bearing interest at six per cent per annum from date until paid, and said ten monthly installments being evidenced by ten promissory notes of even date herewith, executed by the Lessee to the Lessor, and delivered to the Lessor on the date of the execution of this lease. * * As a further bonus to the Lessor, and a further consideration to the Lessor for making this lease, and not as rent, the Lessee hereby agrees to pay to the Lessor, the sum of Seventy-five Thousand Dollars ($75,000) in lawful money of the United States, in installments, without interest, as follows: Seventy-five Hundred Dollars ($7500) on January 1st, 1929, and Seventy-five Hundred Dollars ($7500) on the first day of each and every month thereafter to and including the last installment thereof on October 1st, 1929.

\* \* \* \* \* \*

"It is provided and understood, however, that if at the time when this lease comes into operation, on November 1st, 1929, this Lessee, as Lessee in the lease upon said premises now in effect between the parties hereto which terminates on October 31st, 1929, shall have been in default under any of the terms thereof, or if for any reason the said lease now in effect shall have been terminated, then and in that event this lease shall be inoperative and shall be voided and the moneys which shall have been paid in consideration of the execution of this lease shall be held and retained by the Lessor without any payment whatever being made on that account to the Lessee."

The payments of $19,000.00, $26,000.00, and $75,000.00 mentioned in the lease were made by Grand Central to decedent in 1922, 1923 and 1929, respectively, as specified in the lease. As seen above, from January 1, 1922, to December 27, 1932, the books and accounts of decedent were kept and his returns were filed on the accrual basis. No record was made on the books of account with respect to the $75,000 to be paid by the lessee in 1929 under the second lease until June 30, 1925, on which date an entry was made debiting "Future Rents" and crediting "Unearned Bonus on Lease" with that amount. On December 31, 1925, the account "Future Rents" was credited with the amount of $75,000 and "Bonus Receivable" was debited with a like amount. As and when the payments were made by the lessee during the period from January 1, 1929, to October 1, 1929, the account "Bonus Receivable" was credited so that on the latter date the amount of $75,000 had been completely eliminated from that account. The aggregate amount of $120,000, representing the

amounts of $19,000, $26,000, and $75,000 credited to "Unearned Bonus on Lease," was amortized and credited to income on the books of the decedent at the rate of $1,000 a month beginning November 1, 1929, and the amounts so credited to income have been reported by the decedent in his income tax returns for the taxable years in which the credits were made.

In determining the deficiency for 1929 the Commissioner eliminated from income the amount of $2,000 reported by the decedent as representing amortization of the $120,000 and included therein the amount of $75,000 received by decedent in that year in accordance with the terms of the lease. The Board approved this action.

The question presented is whether the $75,000 payable under the second lease was income to the lessor in 1922, the year the lease was executed. If so, the decision of the Board must be reversed. A determination of that question depends upon whether, in 1922, there arose to the taxpayer "a fixed or unconditional right to receive" the sum promised to be paid in 1929. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 54 S.Ct. 644, 78 L.Ed. 1200; H. Liebes & Co. v. Commissioner, 9 Cir., 1937, 90 F. 2d 932, 937, 938.

The Board interpreted the lease provisions to mean, that though the $75,000 was agreed to as a bonus and as a consideration to the lessor for the making of the lease, that nevertheless he had a right only to the moneys actually received by him prior to termination of the original lease and that no sums which had not become due and payable prior to such determination could be collected. With this construction of the lease we do not agree.

An examination of the lease discloses that the last installment of the $75,000 was to be paid on October 1, 1929, and that the term of the lease began November 1, 1929. The entire amount of the $75,000 then, was payable prior to the time when, by its terms, the second lease would become effective. The document further provides:

" * * * that *if at the time when this lease comes into operation, on November 1st, 1929,* this Lessee, * * * shall have been in default under [the first lease] * * * or if * * * said lease shall have been terminated, *then and in that event*

this lease shall be inoperative and shall be voided and the moneys which shall have been paid in consideration of the execution of this lease shall be held and retained by the Lessor without any payment whatever being made on that account to the Lessee." [Italics added].

We construe this provision as meaning that a default by the lessee under the first lease or a termination thereof would not operate to void the promise to pay the $75,000 contained therein prior to November 1, 1929, the date on which the second lease was to become operative. On this date full performance by the lessee of his promise to pay the $75,000 would have become due.

It appears then that the $75,000 was payable in all events—the promise was limited by no condition precedent. Nor was a condition subsequent attached to the promise to pay—performance by the lessee would not be excused by reason of his default or by the termination of the first lease. 1 Restatement of Contracts § 250, p. 359.

Our interpretation of the lease clause is seen to be in accord with the apparent intention of the parties, when it is read in connection with the recital appearing elsewhere in the lease that the agreement to pay the $75,000 is " * * * a further bonus to the Lessor, and a further consideration to the Lessor for making this lease and not (as) rent. * * * " It seems clear that in the contemplation of the parties the $75,000 was fully earned by the lessor upon execution of the lease, and that his right to it was not dependent upon the occurrence of any further event.

Applying the test set out in Spring City Foundry Co. v. Commissioner, supra, it appears then that the $75,000 accrued as income in 1922, the year in which the lessor acquired an unconditional right to receive it, providing that there was a reasonable expectancy that the right would be converted into money or its equivalent. Jennings & Co. v. Commissioner, 9 Cir., 1932, 59 F.2d 32; H. Liebes & Co. v. Commissioner, supra, page 938. Respondent makes no contention that there was not such a reasonable expectancy here.

The decision of the Board is affirmed on the Commissioner's petition for review and reversed on the taxpayer's petition for review.