HELVERING, Com'r of Internal Revenue,
v. ROTH et al.

No. 99.

Circuit Court of Appeals, Second Circuit.

Nov. 4, 1940.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Newton K. Fox, Sp. Assts. to Atty. Gen., for petitioner.

Louis L. Hamby, of Washington, D. C., for respondents.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The Commissioner appeals from three orders of the Board of Tax Appeals expunging certain deficiencies which he assessed against the three respondents upon their income taxes for the year, 1935. It is not necessary to consider more than the deficiency assessed against the trustees of Henry Roth, as to which two questions arise: (1) Whether certain payments made to the trustees upon a construction contract shall be treated as income; (2) whether the payment to them of certain notes was income, because the notes had been appraised as worthless when Roth's estate was valued for estate tax purposes.

The facts relied upon to support the deficiency under the first point are as follows. Henry Roth, who died in 1918, owned 300 of 1,000 outstanding shares of the Newman & Carey Subway Construction Company; Henry Newman owned 350, William Newman 120, and James L. Carey 230 shares. This company had undertaken in 1915 to build a piece of subway in the City of New York, and Roth lent it $250,000 to finance the work. Later, performance having turned out to be more expensive than was expected, Roth agreed to procure such money as was necessary to complete the subway, and in the end he, or his trustees after his death, advanced in all $798,411.10. Some of the notes on which Roth or the trustees procured the necessary funds were endorsed by the Newmans and Carey, some were not; but Roth's trustees asserted that the three were liable for all advances in proportion to their holdings. The Newmans and Carey denied this and a long negotiation followed which ended in a contract by which they agreed to pay their proportionate part of the advances without interest; not unconditionally, however, but only as therein described. They were holders of shares in another company, called Necaro Co., Inc., which was apparently profitable; in any event they agreed to apply one-quarter of the divi-

dends paid to them upon their shares in this company upon their obligations to the trustees. In addition, they agreed that if any of them should die before payment of his proportion was complete, one-quarter of his Necaro shares should be transferred to the trustees in satisfaction. All parties to the contract agreed that, if the construction company collected any money under the contract, it should be paid to the trustees who should credit it upon the debt owed them up to the amount of the whole principal; any surplus to be credited to interest. Such a payment of $20,000 was made in 1925. William Newman died in 1926 and the trustees took his Necaro shares at a valuation of $19,305.35; before 1935, Henry Newman and Carey had. paid $80,000 out of Necaro dividends. In that year the trustees received $986,864.95 out of a judgment against the city, of which $679,105.60 was "treated"—by whom does not appear—as repayment of principal and $307,759.35 was interest. (The principal is the difference between the total of Roth's advances, less $20,000 and the amounts received from the Newmans and Carey.) The Commissioner held that the whole sum of $307,759.35 was interest and assessed the tax accordingly; the Board held that the payments made by the Newmans and Carey did not reduce the principal of the debt, qua Roth, and that therefore in computing the interest—and therefore the income—received by the trustees, they should be deducted. Henry Newman's executors later made a claim against the trustees for the sum of $50,000 paid by him out of Necaro dividends, on the theory that the trustees were entitled to no interest until they had repaid the contributions of the other shareholders. This claim was settled, but neither William Newman, nor Carey ever made any similar claim.

▪ Both sides have argued the case strictly upon the basis of the actual language of the contract, disregarding the underlying relations of the parties. Of course it is true that the rights and liabilities created depend upon what was said; yet it is impossible to understand the words without considering the setting in which they occurred. All the parties, or their predecessors, had been shareholders in the construction company, and the trustees were insisting—in spite of the fact that the Newmans and Carey had not endorsed all the notes as Roth had—that all the shareholders had agreed to be proportionally responsible for the company's debts. The Newmans

and Carey denied this and the contract is to be read as primarily a settlement of the issue so raised. Had they unconditionally admitted liability as the trustees asserted it, there can be no doubt that they would have been entitled to contribution from the trustees in reïmbursement of their advances, and it would have been a consequence that the trustees' interest—i. e. their income—would have been reduced accordingly. Indeed, strictly speaking, the trustees would have been bound to apportion the interest also. The case turns upon how far the contract modified these obligations which the law would otherwise have fixed; and we can find nothing which could be thought to do so unless it be the limitation of the liability which the Newmans and Carey secured. They did indeed agree to be liable in proportion to their share holdings, but they stipulated, as we have seen, that the liability so conceded should be limited to a quarter of the income from their Necaro shares and to a quarter of the value of the shares of any of them who died before he had paid in full. Ought this be read as the surrender of all rights of contribution in case the company reïmbursed the trustees— a surrender made in consideration of the limitation of the liability; or should the liability, though limited, still be regarded as that of a co-surety? If the Newmans and Carey had acknowledged the liability, it might plausibly be argued that the limitation was a consideration for the surrender; it would indeed have been hard to find any other quid pro quo. But they did not acknowledge the liability; as we have said, it was the primary object of the settlement to get some acknowledgment of it. That being so, it seems to us far more reasonable to say that the contract preserved all the incidents of the liability so far as it was acknowledged at all; that is to say, that what the Newmans and Carey paid, they paid as co-sureties, that being the only possible theory on which the trustees could assert any claim against them. If so, the trustees were liable to them for the principal of their advances as soon as the trustees were themselves reïmbursed.

We can find nothing in the contract which forbids this interpretation; it is writttten precisely as it would be if the parties had expressly agreed that the obligors should have the status of co-sureties, except of course that that was not declared. Moreover, Henry Newman's executors successfully asserted that status after the judgment was paid. It is true that William Newman

and Carey did not do so; perhaps they have abandoned any claims they had; but as evidence of practical construction of the contract their failure is not important; and if they have in fact abandoned their claims, and if for that reason the resulting profit ever became income to the trustees, it did not become so in the year when the judgment was paid but in that of the abandonment. For these reasons it appears to us that of the proceeds of the judgment paid in 1935, only the difference after subtracting what the Newmans and Carey paid was income of the trustees in that year. As to the first point we therefore affirm the Board.

The second point arose from the following facts. When Roth died in 1918 he held a number of notes of the construction company on which he had been an endorser and which he had had to take up. In the appraisal of his estate these were taken as worthless, no doubt because it was then supposed that the construction company was hopelessly insolvent. However, when the judgment was paid, the construction company took up these notes from the trustees, and the Commissioner treated the amount then received as income for 1935 on the theory that it was a gain; i. e. an increase in the value of property which had constituted part of the estate in the trustees' hands. The Board held otherwise, relying upon United States v. Carter, 5 Cir., 19 F.2d 121. It is true that the Fifth Circuit by a divided court there held that, when partnership accounts had been valued at the testator's death at any amount less than what the surviving partner collected, the difference was not income in the executors' hands. We cannot see, however, what is lacking to put such a situation within § 111 (a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Code, § 111(a), unless it be that the payment of a note does not "dispose of" it. That section provides that income shall include "the gain from the sale or other disposition of property"; and while § 111(c) and § 112(a), 26 U.S.C.A. Int. Rev.Code, §§ 111(c), 112(a), speak of "sale or exchange," we do not think that there was a difference in intent between that locution and "sale or other disposition." Even if we read the statute literally, the maker of a note usually takes it up when he pays it, and, if it somewhat forces the language to speak of that as an "exchange," certainly it can properly be said to be a "disposition of" the note. However, we do not wish to decide the point so verbally. There can be no doubt that such a transaction results in a gain to someone, and § 22(a), 26 U.S.C.A. Int.Rev.Code, § 22(a), included "gains * * * of whatever kind." The notes by hypothesis were worthless when the executors got them; it was not a case of mistake as to their value; they were worth what the executors could have realized on them and that was nil. When they were paid in full, there was certainly a realized gain and not a mere increase in value. The general intent of the statute was to tax all realized gains and the only possible question is whether the language was so inept as to let such a case escape through its meshes. We can see no reason for so restricting its scope.

Order affirmed as to the payments of interest; reversed as to gain from the note.