## ELVERSON CORPORATION v. HELVERING, Com'r of Internal Revenue.

## HELVERING, Com'r of Internal Revenue, v. ELVERSON CORPORATION.

No. 360.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1941.

Floyd F. Toomey, Ellsworth C. Alvord, and Karl Riemer, all of Washington, D. C. (Alvord & Alvord, of Washington, D. C., of counsel), for Elverson Corporation.

F. E. Youngman, Sp. Asst. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and

J. L. Monarch, Sp. Asst. to Atty. Gen., for the Commissioner.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon petitions by the taxpayer and the Commissioner to review an order of the Board of Tax Appeals which modified and affirmed a deficiency assessed for the year 1934 against the taxpayer upon its income tax and excess profits tax, and which expunged an assessment against it as a "personal holding company" for surtax and penalty. The question upon the taxpayer's appeal is whether by a transaction which occurred on October 17, 1934, the taxpayer "realized" a "gain" within the meaning of § 22 (a) of the Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 669, and, if so, how much it was; that upon the Commissioner's appeal is whether, assuming that the taxpayer was a "personal holding company" under § 351 of the Act, 26 U.S.C.A. Int.Rev.Acts, page 757, it was liable to a surtax under that section because the "gain" was "interest," and to a penalty under § 291, 26 U.S.C.A. Int.Rev. Acts, page 750, for failing to file any return as such a company.

The relevant facts may be summarized as follows. On March 4, 1930, one, Raymond Patenotre, sold to a corporation, which we shall call the Ledger Company, all his holdings in a Philadelphia newspaper—the "Philadelphia Inquirer"—whose assets were divided between two corporations. Patenotre owned 151,000 shares of the common stock of the Philadelphia Inquirer Company of Delaware, which we shall call the Delaware Company, and which owned all the assets of the paper except the real estate; and he owned 2,750 shares of the stock of the Philadelphia Inquirer Company of Pennsylvania, which we shall call the Pennsylvania Company and which owned the real estate. He received for the Delaware Company shares $5,250,000 in cash and $3,050,000 in "Series A" notes; and for the Pennsylvania Company shares $2,200,000 in "Series B" notes. The notes of both series were signed by the Ledger Company, bore interest at 6%, and were payable in equal quarterly instalments over a period of ten years; John C. Martin, then vice president of the Ledger Company, endorsed them all. The Delaware Company shares were pledged with a trustee to secure both series; the deed provided for their propor-

tional release as the notes were paid off, and that, after any default in principal or interest for thirty days, the trustee might accelerate the principal and sell the collateral. By various transfers not necessary to describe, the taxpayer, a corporation of which Patenotre owned all the shares, had by June 2, 1933, acquired the greater part of both "Series A" and "Series B," then outstanding, for which it paid in cash $4,745,000.

Notwithstanding an earlier extension of their maturity, the Ledger Company had no immediate funds with which to meet the principal of some of the notes on April 3, 1934, and on that day it made an agreement with the taxpayer which extended until 1940 and 1941 the due date of eight of them, aggregating $525,000, which were to fall due in 1934. By this agreement the Ledger Company on its part transferred to the Delaware Company the name, the good will and the Associated Press franchise of the morning edition of its own newspaper, the "Public Ledger"—daily and Sunday—and promised not to publish any such newspaper in Philadelphia until March 4, 1941. The Ledger Company also agreed not to declare any dividend upon the Delaware Company shares, to maintain that company at its then financial level, and to execute and deliver to the trustee as further security for the notes an "income bond" in the principal sum of $1,400,000. This bond bore 6% interest, payable, however, only "out of available net earnings of the company, * * * Such interest shall not be cumulative up to and including September 4, 1938. * * * After September 4, 1938, such interest shall be cumulative." Both principal and accumulated interest were to become due on March 4, 1952. Besides extending the due date of the eight notes, the taxpayer promised, in case the Ledger Company should default for thirty days in the payment of principal and interest on any of its notes, that the trustee should cancel all outstanding notes upon the surrender to it by the Ledger Company of its equity in all the Delaware Company shares still in pledge. In that event the "income bond" was also to be cancelled and John C. Martin was to be released. The taxpayer also agreed, if the shares were so returned, to pay the indebtedness of the Ledger Company to the Delaware Company up to $600,000 by buying from the Ledger Company unpledged shares of Delaware Company stock at the price of $53.75. (A final provision in this contract required the tax-

payer to buy all other free shares of that stock owned by the Ledger Company at a price to be agreed upon, but as the parties failed to agree when the time came, we may disregard this stipulation.)

The Ledger Company did default in the payment of interest upon the outstanding notes of both "Series A" and "Series B" on September 4, 1934, and on September 18th its directors ordered its officers to rescind the contract of April 3, 1934, as therein provided; that is, to surrender its equity in the pledged shares, and procure a cancellation of the notes and the "income bond." This was done on October 17th; the trustee delivered 136,000 Delaware Company shares—all that remained pledged —to the taxpayer and cancelled the notes and the "income bond"; and the taxpayer paid the indebtedness of the Ledger Company to the Delaware Company by buying 10,550 unpledged shares at $53.75. The Commissioner decided that the taxpayer had "realized" a "gain" by this transaction, measured by the difference between the value of the Delaware Company shares on October 17, 1934, which he appraised at $44, and the cost of the notes; i.e. the amount paid to Patenotre by the taxpayer. He also held that the "gain" so "realized" was "interest" within § 351(b) (1) (A) of the Act of 1934 and assessed a surtax and penalty accordingly. The taxpayer appealed to the Board which held that the taxpayer had "realized" a "gain," which it computed by appraising the Delaware shares at $37.50 and allowing as their cost the amount which the taxpayer had paid for the notes; but it expunged the assessment for surtax and the penalty because the "gain" was not "interest" within § 351(b) (1) (A). Both parties then appealed to this court.

 It is true that the exchange of the Delaware shares for the notes on October 17, 1934, was not a "sale or exchange of a capital asset" within § 117(a) of the Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 707. Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Bingham v. Commissioner, 2 Cir., 105 F.2d 971. It is not so clear however that it is not a "sale or other disposition of property" under § 111(b), 26 U.S.C.A. Int.Rev. Acts, page 692. When the maker of a note pays the note and it is cancelled, it ceases to be "property," and perhaps there has been no "exchange of property," but it does not follow that the holder of the note does not "realize" a "gain" when he receives more than he paid for it. Helvering v. Roth, 2 Cir., 115 F.2d 239. Indeed, if the note is "registered" or bears coupons, the statute itself provides, § 117(f), 26 U.S.C.A. Int.Rev.Acts, page 708 that the sums received upon its "retirement" shall be "considered as amounts received in exchange." De facto the taxpayer at bar certainly did "realize" a "gain," upon the notes, if the Board appraised the shares correctly, for it had paid Patenotre less for them than it received from the Ledger Company. The taxpayer's answer, as we understand it, is that the agreement of April 3, 1934, offered two alternatives to the Ledger Company; first, to go through with the original purchase, paying the "income bond" as well as the notes; and second, to rescind the original purchase of the shares. The first would indeed have resulted in a "gain," for interest on the notes and the "income bond" would have been paid; it would have been like the successful outcome of an underwriting, discussed in Grigsby v. Commissioner, 7 Cir., 87 F.2d 96. But the second alternative could not result in "gain," because the taxpayer merely acquired the shares, and no "gain" is ever "realized" by the mere purchase of property at less than its value. Palmer v. Commissioner, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50.

The fallacy of this reasoning lies, we think, in failing to distinguish between the surrender of the notes and the acquisition of the shares. Whenever anyone surrenders a thing of value for another thing of value, the surrender will for tax purposes ordinarily close the transaction by which he acquired the thing surrendered, and normally he will "realize" a gain or loss. For example, if he exchanges property for property, he will close the transaction by which he obtained the property which he transfers, and the "amount realized" will be the market value of the property he receives. § 111(b). But the transaction will still remain open as to the property which he receives for as long as he retains it. When one buys property for cash, it might have been argued that in theory he too "realizes" a gain upon the cash if the property received has a value greater than the cash; but that would have involved the premises that there had been an increase in the value of the cash, "realized" by purchase, and that would have done great violence to our notions about money. Hence the doctrine that a

298

cash purchase is always "unrealized" gain. But notes are not cash; everyone understands that they can, and do, change in value; they pass from hand to hand like other property and are bought at a discount or at a premium. If their maker pays them in cash, a buyer, who has bought them for a discount, "realizes" a gain. Helvering v. Roth, supra (115 F.2d 239); National Bank of Commerce v. Commissioner, 9 Cir., 115 F.2d 875. We can see no possible distinction when the maker uses property, as he did here.

The taxpayer also claims the right to deduct from any "gain realized" upon the notes the excess of the amount paid for the 10,550 unpledged shares at $53.75 over their value at the time, $37.50. It is clear that this excess cannot be regarded as part of the cost of the notes, and it must be remembered that the deficiency is assessed upon the "gain realized" upon their disposition and not upon the disposition of the pledged shares. However, that would not be an insuperable obstacle, if the excess were a "realized loss," because, although as we have said, it could not figure as part of the cost of the notes, it could reduce the "gain realized" upon their disposition by reducing the "amount realized" upon them. And it would indeed seem to be proper to do this, because since the pledged shares were delivered in consideration, not only of the cancellation of the notes, but of the purchase of the 10,550 shares, some allocation should be made between these two considerations. But that possibility is foreclosed because there was no "realized loss" and no excess upon the purchase of the 10,550 unpledged shares, nor can there be until they are sold. When they are, the taxpayer may have a deduction; until then the apparent excess remains "unrealized."

■ The remaining question upon the taxpayer's appeal is the value of the Delaware Company shares, which was the subject of much conflicting testimony. The taxpayer called four experts, the Commissioner two, and the Board appraised the shares at the same value as that given by the lower of the Commissioner's experts, though not for the same reasons as he. The value of the shares depended, as all value does, upon their future earning power, obviously a highly speculative matter as to which no forecast is much better than a guess. We cannot say that the figure taken was so unreasonable that we

must upset it; an attempt by us to fix another would not be likely to strike nearer the unattainable mark. The taxpayer's most persuasive argument is that at $37.50 the shares were worth $5,100,000, and that the face of the notes was only $3,488,750. If the value fixed by the Board was right, the Ledger Company was making a present of about $1,600,000 to the taxpayer, which is absurd. The difficulty with this argument is that it assumes that the Ledger Company had only the notes to pay; it forgets the "income bond." That was absolutely due in 1952 and must be counted as part of the purchase price. True, that date was eighteen years off, but the bond was an obligation meanwhile. It would also absorb $84,000 of the annual profits, and after 1938 any deficit would cumulate and become due with the principal. If for example the profits of the paper after 1938 were no more than enough to keep down the interest on the notes, the Ledger Company would find itself faced in 1952 with a debt of about two and a half million dollars. Finally, Martin was an endorser on the notes and he had become president of the Ledger Company. Surely these considerations were enough to make it a reasonable decision to rid the company of these obligations by calling off the whole venture even though the shares had the value at which the Board appraised them.

■ There remains the Commissioner's appeal, which has been presented on the theory that the consideration given for the taxpayer's extension of the notes on April 3, 1934, must have been "interest." This misconceives the agreement; the gain for which the taxpayer is assessable arose, not from what it received for extending the notes, but from a condition which it was forced to allow the Ledger Company to attach to what the taxpayer received. The consideration for the extension was the addition made to the value of the Delaware Company shares, and the "income bond"; these were all the taxpayer received. It had to agree however to allow the Ledger Company to call off the whole bargain, and the gain for which it is assessed is the consequence of the Ledger Company's so doing. It is true that in a very indirect sense that gain results from the extension, because the Ledger Company was pressed into rescinding by the burden of the "income bond" and the notes. But it would do extreme violence to the word "interest" to wrench it so far.

Order affirmed.