C. G. MEAKER CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

IVANHOE FOODS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 25290, 25899.   Promulgated June 14, 1951.

*Ralph W. Levinson, Esq.*, and *F. Robert Gilfoil, Esq.*, for the petitioners.

*Sheldon V. Ekman, Esq.*, for the respondent.

OPINION.

RICE, *Judge:* Subsection (a) of section 111 of the Internal Revenue Code provides that "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis \* \* \*." Subsection (b) provides that "the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

Regulations 111, section 29.111–1 provide:

\* \* \* Except as otherwise provided, the Internal Revenue Code regards as income or as loss sustained, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent. The amount realized from a sale or other disposition of property is the sum of any money received plus the fair market value of any property which is received. The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value. \* \* \*

Respondent argues that the value of the lease exchanged for the capital stock of Ivanhoe is the fair market value of the stock as of the time of the transaction involved herein. Meaker argues that the value of the stock is not binding upon it as it received a lease for 10 years and not the stock as a result of such transaction. Respondent attempts to meet this argument by stating in his brief that even if the lease and not the stock be considered the property received by petitioner Meaker, within the meaning of section 111 (b), the value of the lease is equal to the value of the stock which Meaker surrendered to Ivanhoe in payment for the lease. Respondent further argues:

Reduced, then, to fundamentals, if the lease was exchanged for the stock and the stock for the lease, it is impossible to derive any other conclusion from the facts than that the market value of the stock was equal to the market value of the lease. *Portland Damascus Milk Co.*, 22 B. T. A. 1236, 1238 (1931).

While, in general, it is true that properties exchanged for one another in an arm's length transaction can be assumed to be of equal value, such

is not necessarily always the case. In *Portland Damascus Milk Co.* the issue resolved around the basis for allowing depreciation on a leasehold. The Court said at page 1238:

\* \* \* Cost is the basis, but as stock was issued rather than cash paid, the value of the stock at the time must be determined. The only witness testifying on this matter was produced by the petitioner and he was emphatic that the stock was worth par and that the leasehold was of a value at least equal to the par value of the stock, viz., $56,250. This testimony was not weakened on cross-examination, and must prevail unless for other reasons the cost must be placed at a different figure. \* \* \*

Ordinarily it is fair to assume that, when two taxpayers exchange property for property in a business transaction, each taxpayer regards itself as getting its money's worth and the same value for tax purpose is placed on the two pieces of property exchanged. However, there is nothing in the statute or in the regulations which precludes us from placing a different valuation on the lease and the stock transferred for it, if the facts justify such a result. See *Pierce Oil Corporation*, 32 B. T. A. 403, 429 (1935); *Elverson Corporation*, 40 B. T. A. 615 (1939), affd. (C. A. 2, 1941), 122 F. 2d 295; and *Estate of Isadore L. Myers*, 1 T. C. 100, 111 (1942).

In this case we have an arm's length transaction in the sense that no element of gift was present and in the sense that neither petitioner was attempting to help the other reduce its tax liability. On the other hand, it was not an arm's length transaction in the ordinary sense because of the emotional feelings which had been generated by the family dispute and because of the undercurrents flowing from the legal maneuverings of the parties. Ivanhoe had been sued by Meaker for an accounting and the suit was still pending. Its outcome and the eventual control of Ivanhoe was uncertain. This put pressure on Ivanhoe and its president. On the other side of the picture Ivanhoe had threatened to put Meaker out on the street on October 1, 1945, and Meaker was unable to find any other building where it could house and store its merchandise which was valued at that time, according to the testimony, at $130,000 for the merchandise in the warehouse with $130,000 more "rolling in." This put pressure on Meaker. Ivanhoe would take no cash for the lease but insisted that Meaker give up the stock or quit the premises. Meaker was willing to pay $65,000 cash for a 5-year lease and there was testimony that it might have been willing to pay $130,000 cash for a 10-year lease. On these facts it is clear that the parties were not dealing in an arm's length transaction in its ordinary business sense. The officers of both petitioners were under emotional strain and acted in a manner which they quite probably would not have, if they had been dealing with other parties. Ivanhoe wanted the stock in preference to $130,000 cash even though the stock was worth less. Meaker was willing to pay $65,000

for a 5-year lease and might have been willing to go as high as $130,000 cash for the 10-year lease, rather than give up its stock in Ivanhoe, irrespective of the market value of the stock. This was no ordinary business transaction where it is fair to assume that the properties exchanged had the same value for tax purposes. To the contrary, if the fair market value of the lease and the stock were identical, as contended by the respondent, it would be a remarkable coincidence.

A generally accepted definition of fair market value is the price at which a seller, willing to sell at a fair price, and a buyer, willing to buy at a fair price, both having reasonable knowledge of the facts, will trade. It is a question of fact to be determined from all of the evidence. *Elverson Corporation, supra.*

Meaker called two real estate brokers of Auburn, New York, for their expert opinions as to the value of the lease. The first broker testified that in his opinion the fair market value of the properties in question was $13,000 a year based upon a $370,000 replacement cost less depreciation of $240,000 resulting in a value of $130,000 on which a return of 10 per cent should be realized. The witness gave consideration to the conditions of the buildings, the location of the property with respect to railroad and highways for truck transport, the particular construction of the buildings for the purpose for which they were used, the available railroad siding and loading docks, and the scarcity of similar warehousing space in or near Auburn, in 1945.

The second broker testified that he had been assigned by Empire Foods, Inc., (the assignee of the lease from Meaker) to show the same property for rent for $12,000 per year for the unexpired portion of the lease. He also testified that about 47,000 or 48,000 square feet of the premises had been rented to others by Empire Foods and that he was holding the vacant portion (approximately 5,000 square feet) for a rental of $1,500 a year. He also stated that he had had an offer of $1,200 a year for said vacant space but agreed on cross-examination that, generally speaking, you could get proportionately more rental for a small portion of space than you could for a much larger space such as 50,000 square feet. This witness did not know how much rental the then tenants were paying to Empire Foods.

Meaker had been leasing the warehouse building from Ivanhoe for approximately 16 years and had paid an annual rental of $6,600 until October 1, 1944, when the rent was reduced $150 a year. This reduced rental continued until the new lease was entered into. The new lease contained a provision that if the lease was cancelled Ivanhoe would pay Meaker a yearly rental of $6,000 per year for the unexpired term of the lease.

On December 18, 1945. Meaker sold its wholesale grocery business to Empire Foods. Inc., and assigned its lease to Empire in consideration of the sum of $78,975.

On the basis of the whole record in this case, we have found as a fact, and we conclude that the fair market value of the lease received by Meaker in exchange for its Ivanhoe stock was $81,000. In arriving at this conclusion, we have given consideration to the testimony of Meaker's witnesses, the yearly rental paid by Meaker to Ivanhoe over a 16-year period, the value placed on the lease by Empire Foods when Meaker assigned the lease to Empire, the condition of the building, its construction, and the scarcity of similar warehousing space in or near Auburn, New York, in 1945.

With respect to the fair market value of the Ivanhoe stock, respondent adduced expert testimony to the effect that on October 1, 1945, it was worth not less than $81,000 and not more than $82,332.27. Respondent argues that those valuations are supportable in a number of ways. The first method is by reference to the book value of Ivanhoe stock which appeared on the books and the balance sheet of Ivanhoe at $290,823.27. This represented the book value of 13,551 shares of preferred, 13,551 shares of Class A, and 13,473 shares of common outstanding. In 1945 a two-share unit, consisting of one share of preferred and one share of Class A, was selling at $15 per unit. Respondent applied the price of $15 per unit to the 13,551 units outstanding and arrived at a value of $203,265. He deducted this figure from the total book value of $290,823.27 and arrived at a remainder of $87,558.27 from which he concluded this amount was attributable to the 13,473 shares of common stock, or a value of $6.4988 per share. He then applied such valuations to the 3,060 units and 5,606 shares of common which Meaker transferred to Ivanhoe and concluded that their fair market value was $82,332.27.

Ivanhoe argues that the value of the stock transferred for the lease was $45,900 determined by multiplying by $15 the 3,060 two-share units received by Ivanhoe. Ivanhoe argues further that arrears on the preferred stock were $39.87 per share at September 30, 1945, for a total of $540,346.13. This was in excess of the surplus of the company by $378,626.38. Ivanhoe also pointed to the fact that in addition to dividend arrears the preferred stock is entitled to $50 preference and that Class A stock was entitled to a $25 preference over the common stock. It also contends that the company would have to earn a total of $1,404,951.38 (over and above income and franchise taxes) before the common stock could receive anything and that, in view of the poor earnings record of the company in the 15 years prior to September 30, 1945, the common stock could not be considered to have any fair market value.

Ivanhoe argues, finally, that the "blockage rule" must be invoked in determining the fair market value of the stock. It states, on brief, that the prevailing market is for a normal volume of shares of its stock; that the placing of 3,060 two-share units of this stock in the

normal market would result in a lowering of the price obtainable for these shares; and that the amount by which the figure of $45,900 (which is the fair market value contended for by Ivanhoe) would be decreased by the application of the blockage rule is a question for judicial determination. Ivanhoe's petition on this issue is vague and uncertain. Ivanhoe cites us no authority for the proposition stated, and, more important, it adduced no evidence at the hearing with respect thereto. The record is silent as to how much, if any, the fair market value of the stock should be reduced by the application of the blockage rule. We, therefore, conclude that the "blockage rule" is inapplicable.

Meaker argues that respondent's computation of the book value of Ivanhoe's stock is erroneous because the balance sheet used by respondent showed a value for the stock subscription account of $10.565. Meaker says that unrecorded stock subscriptions of $47,204.65 for Ellis Meaker and $3,374.50 for one L. S. Sawyer, or an additional stock subscription of $50,579.15, should have been added to the amount used by respondent. Meaker contends that this would have increased the book value of the stock to $341,402.15, and, using the same method of computation used by respondent, the common stock would have had a book value of $10.2529 per share. Meaker finally concludes that the fair market value of the Ivanhoe stock was at least $103,377.75.

The common stock carried voting power which, of course, carried with it some value in a going concern. While the dividend history of Ivanhoe was not encouraging and arrearages in preferred dividends made it unlikely that any dividends would be paid on common in the foreseeable future, the voting power vested in the common, carrying with it the power to determine corporate policies, elect members of the board of directors, and determine compensation of officers and employees, would give it some value. Respondent's expert witness placed the value of the common stock at approximately $6.50 per share. In arriving at such figure he studied the financial structure of companies in the same general line of business as Ivanhoe and also studied the financial condition of a group of companies not in the same business but which were comparable, from a financial standpoint, to Ivanhoe. Such study and analysis led him to a fair market value of approximately $6.50 a share for such common stock.

We are of the opinion that the valuation of the common stock by the respondent is too high. From a careful study of all of the evidence in this case, including the expert testimony of respondent s witness, the basis upon which such testimony was founded, the voting power of the common stock, the arrearages and dividends on the preferred stock, the preferential position of the preferred and Class A stock over the common stock upon liquidation, and the other relevant facts, we conclude that the fair market value of the two-share units was, on October

1, 1945, $15 per unit, and the fair market value of the common stock on that date was $3 per share, or a total of $62,718 for the stock acquired by Ivanhoe.

Ivanhoe, on brief, raises the issue that since Ivanhoe merely received its own capital stock for the lease, it did not receive any taxable income nor realize any gain or loss. It states as a proposition of law that the accepted interpretation of such transactions are to the effect that no gain or loss is realized on the purchase by a corporation of its own stock. It cites section 29.22 (a)–15 of Regulations 111 and argues:

> In the instant case we do not have a corporation dealing in its own stock as it would the shares of another. It acquired the stock for the purpose of putting an end to a dispute between the management of the corporation and the holder of a fairly large block of its stock. That the consideration paid therefor was not cash but was, instead, a lease for a term of ten years does not alter the true nature of this acquisition.

Ivanhoe goes on to argue that it underwent, in effect, a partial liquidation and that the only beneficiaries of the transaction were the remaining stockholders.

The answer to such an argument is twofold. First, Ivanhoe did not plead such issues in its petition and they are, therefore, not properly before this Court. Second, if a corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Meaker had been leasing the buildings in question from Ivanhoe for approximately 16 years and had paid a cash rental during the entire time. The transaction in question is similar to the lease arrangements in prior years with the exception that instead of cash being the commodity exchanged for the lease, on this occasion the stock of Ivanhoe was used as a medium of payment. The situation was exactly as it had been in prior years and Ivanhoe must treat its own shares of stock as the equivalent of cash. *Trinity Corporation*, 44 B. T. A. 1219, affd. (C. A. 5, 1942), 127 F. 2d 604, certiorari denied, 317 U. S. 651 (1942). See *Lencard Corporation*, 47 B. T. A. 58.

Ivanhoe also contends that the lease was consummated on September 30, 1945, and that if it is determined that rent income was received by Ivanhoe, it was received in the fiscal year ended September 30, 1945, and not in the fiscal year ended September 30, 1946, as contended by respondent. It relies, for this proposition, on *Commissioner* v. *Lyon* (C. A. 9, 1938), 97 F. 2d 70. That case involved a lease which provided that a cash payment of $75,000 was to be made at the commencement of the 10-year lease on November 1, 1919, and that it should be included in the amount of total rental ($870,000) for the full 10-year term. The rent was payable in monthly installments of $7,000 in advance on the first day of each

month during the first 5 years and $7,500 in advance on the first day of each month for the last 5 years. It was also provided that the $75,000 would be repayable by the lessor only on termination of the lease otherwise than by default of the lessee. The $75,000 was also to be applied on the rent for the last 10 months of the term if the lessee fully performed the covenants and agreements in the lease. The Court held that the $75,000 was taxable income to the lessor in the year in which it was received and said at page 73:

There seems no room for doubt but that where under the terms of a lease a sum is paid on the execution thereof entirely without restriction as to its disposition it is taxable in the year of its receipt. * * *

Ivanhoe argues that, even though the stock was not transferred to it on such date, it became the equitable owner of the stock because, by the instrument of transfer, it was agreed that any dividends which became due and payable on the stock between the time of signing the lease and the time of actual transfer of the stock were to be retained by Ivanhoe.

We have found as a fact that the effective date of the 10-year lease signed on September 30, 1945, was October 1, 1945, and not before. At the time of the signing of the lease on September 30, 1945, Meaker was in possession of the premises under a lease which did not expire until midnight on said date. The new lease by its express terms was "for and during a term of ten (10) years from the 30th day of September, 1945, which term will end the 30th day of September, 1955." It is clear, therefore, that such lease commenced on October 1, 1945. See *Thornton* v. *Payne*, 5 John. Rep. 73 (1809). If the lease were construed to commence on September 30, 1945, it would be a lease for 10 years and 1 day which is directly contrary to the specific language contained therein, that it was for a 10-year term. The record indicates that the parties understood that October 1st was the date of commencement of the new lease. Meaker paid rent as of the 1st of the month for a term ending at midnight of the last day of the month. Ivanhoe's notice of eviction to Meaker stated that Meaker's goods would be "in the middle of Seymour Street on October 1st." The same understanding is reflected in Ivanhoe's treatment of the lease transaction in its Federal income tax returns. No income was reflected from the lease in its return for the fiscal year 1945, but one-tenth of the total alleged value of the stock received was included in its fiscal 1946 return. Cf. *Meeks* v. *Ring* (Sup. Ct. 1889), 4 N. Y. S. 117. In addition to the above, the actual transfer of the Ivanhoe stock was not made by Meaker to Ivanhoe until December 3, 1945; and the indemnity bond required to be furnished by Ivanhoe under the lease was not paid for by Ivanhoe until November 7, 1945, and was not

issued until November 23, 1945. The furnishing of the indemnity bond was one of the material requirements of the lease transaction and the actual transfer of title to the stock on the books of Ivanhoe is to be given considerable significance in determining the correct taxable year in which income is derived. *Commissioner* v. *Segall* (C. A. 6, 1940), 114 F. 2d 706, certiorari denied, 313 U. S. 562 (1941).

*Commissioner* v. *Lyon, supra,* cited by Ivanhoe is not in point. The lease in the instant case was not signed "entirely without restriction" since two specific requirements of the lease were met subsequent to October 1, 1945, viz., that title to the Ivanhoe stock be transferred on the books of Ivanhoe and that an indemnity bond be furnished by Ivanhoe.

It therefore follows that the fair market value of the stock ($62,718) was taxable income to Ivanhoe in its fiscal year ending September 30, 1946. *Commissioner* v. *Segall, supra.*

*Decision will be entered under Rule 50.*