**FIFTEEN HUNDRED WALNUT STREET CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 11882.

United States Court of Appeals
Third Circuit.

Argued Sept. 25, 1956.

Decided Oct. 31, 1956.

Rehearing Denied Dec. 4, 1956.

934

Thomas Raeburn White, Bernard V. Lentz, Philadelphia, Pa. (Mervin M. Wilf, Philadelphia, Pa., on the brief), White, Williams & Scott, Philadelphia, Pa., for petitioner.

Charles B. E. Freeman, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

The sole question involved in this tax case is when the taxpayer realized income. The taxpayer is the successor to the previous owner of premises known as Fifteen Hundred Walnut Street in Philadelphia, Pennsylvania. These premises had for several years been occupied in part by the First National Bank of Philadelphia which had a lease expiring in 1948. There was an option to renew this lease for an additional two years. In the meantime the bank found that it needed additional quarters and made an arrangement with Drexel & Company which occupied a building on the other side of Walnut Street to buy its building. Drexel was thereupon to move into the quarters in 1500 Walnut Street then occupied by the bank. This sublease, however, had to be approved by the landlord corporation.

In 1942 and 1943 agreements were entered into between the landlord (taxpayer here) and the bank. These agreements will be discussed later. Drexel & Company took up its quarters in the building and occupied them during the years 1948, 1949 and 1950 which was the period covered by the extension of the original lease.

The controversy between the Commissioner and the taxpayer turns on the question whether the transactions culminating in 1943 constituted income to the taxpayer at that date or whether income was realized during the years 1948, 1949 and 1950. There is no dispute that income was realized; the controversy turns upon the time.

Taxpayer bottoms its case upon the holding of the Ninth Circuit in Commissioner of Internal Revenue v. Lyon, 9 Cir., 1938, 97 F.2d 70. The proposition stated in that case is that "where under the terms of a lease a sum is paid on the execution thereof entirely without restriction as to its disposition it is taxable in the year of its receipt." At page 73. This proposition is not disputed by the Commissioner. His argument is that in this instance there was no cash payment made to the taxpayer in 1943 and that what the parties did was not equivalent to a cash payment so as to make the Lyon decision applicable.

Counsel for the respective parties agreed at the argument that, if the situation in this case is like Lyon, the taxpayer received income in 1943 and not in 1948, 1949 and 1950. In several of the cases involving the effect of an advance cash payment of rent the court has examined the circumstances surrounding

the transaction and the agreement executed by the parties to determine what the legal consequence of the payment of money was. It is not alone the declaration of intent of the parties, if any, but the sum total of the facts which determine whether the situation is one comparable to that presented in Lyon. See, for instance, Hyde Park Realty, Inc., v. Commissioner, 2 Cir., 1954, 211 F.2d 462; Hirsch Improvement Co. v. Commissioner, 2 Cir., 1944, 143 F.2d 912; Astor Holding Co. v. Commissioner, 5 Cir., 1943, 135 F.2d 47; Clinton Hotel Realty Corp. v. Commissioner, 5 Cir., 1942, 128 F.2d 968.

Following that technique we look at the facts and circumstances here. It is to be noted that the taxpayer itself did not treat the payments herein involved as income in 1943, the year of the transaction. This is not conclusive, but has some significance.

In 1943 the taxpayer was considerably indebted to the bank. The bank held a note [1] as well as unpaid debenture interest coupons of both this Corporation and its predecessor arising out of debts owed to the bank by the taxpayer's predecessor. The bank wanted to occupy other quarters; the taxpayer had to give permission for any sublease. Just what the arrangements were between the bank and Drexel we do not know and the matter does not concern us. We do know what happened on August 21, 1943, pursuant to an agreement of September 4, 1942, and another agreement on May 28, 1943. The taxpayer executed a note to the bank which reads as follows:

"$122,500.00 Philadelphia, Pa., August 21st, 1943.

"On Demand, Fifteen Hundred Walnut Street Corporation promises to pay to The First National Bank of Philadelphia One Hundred and Twenty-Two Thousand, Five Hundred Dollars ($122,500.00) without interest.

" * * * it being intended that the within note shall evidence all of the outstanding indebtedness [arising from named debentures of taxpayer and its predecessor and from a recited promissory note of taxpayer referred to in footnote 1.] * * *

" * * * the entire principal amount of the within note shall be used and applied solely to the payment of rent during such extended term of two years from June 15, 1948, in the same manner as coupons are to be applied for such purpose as provided in said lease as supplemented, and when and as the principal amount of this note is applied to the payment of such rent during such extended term, such payment shall be noted hereon, and at the expiration of said extended term this not[e] shall be cancelled and returned to Maker."

Taxpayer urges that all of the obligations consolidated in the above note were currently due and collectible on August 21, 1943, the date of the note. However, a 1936 supplement to the lease, which is referred to in the last quoted paragraph of the note, provided that some $85,000. then due to the bank on unpaid debenture interest coupons of taxpayer's predecessor, plus all interest which should accrue on those debentures after the 1936 agreement date should be applied only as rental payments on any extension to be made on the original lease. This substantial obligation, not due and collecti-

---

1. This note was given to the bank in 1943 in return for the bank's satisfaction of a 1943 judgment of like amount against taxpayer. Pursuant to an agreement of Sept. 4, 1942, the note provided:

"May 28, 1943.

"On demand [taxpayer] * * * promises to pay [bank] * * * Fifty-three Thousand, Eight Hundred Sixty-eight Dollars * * * without interest. * * * [This note] shall be used and applied * * * to the payment of rent during the extended term of Lease [from 1948 to 1950]. * * * [Bank] further agrees to cancel and return to [taxpayer] any balance of such promissory note which shall not be required for the payment of rent during such extended term."

ble in 1943, was also consolidated in the above note.[2]

We do not think this document which is called a note is equivalent to an unincumbered deposit of cash by the payee. We think it amounts to a substitution of the obligation here for the obligations which the parties had between them prior to its execution rather than a cancellation as contended by taxpayer.[3] The note itself as well as taxpayer's supporting journal entries recited that the note was "intended to *evidence* all outstanding indebtedness * * *" (emphasis added) between the parties. The phrase used was, we think, an accurate description of what the parties were doing. Even if we grant that an unconditional cancellation of indebtedness is as good as an advance payment of money which the landlord is to use "without restriction" as said in Lyon, we do not see such unconditional cancellation in the facts here.

We think that what the transaction amounted to is this: the taxpayer promises to give space to the bank's assignee and the bank promises to credit a portion of the amount of the note month by month until the two years are up.[4] The promises are conditional; each is under obligation to perform for the period. The crediting called for on the part of the bank constitutes income to the landlord over the period of two years. The beginning and end of the transaction make the tax liability fall into the years 1948, 1949 and 1950. This was the view of the Tax Court and we think it was right.

The decision of the Tax Court will be affirmed.

2. The note referred to in footnote 1 supra was also not due and collectible at the time of the August 21, 1943, note into which it was consolidated. However, this earlier note merely replaced a judgment and was part of a plan to substitute a duty to supply space in 1948 to 1950 in return for all other obligations which taxpayer owed to the bank.

3. An inter-office memorandum signed by

the bank's officer who had negotiated with the taxpayer described the August 12, 1943, note as being "In exchange for * * *" various prior obligations of taxpayer or its predecessor which were surrendered.

4. This the bank did by crediting the portion month by month on the back of the note.