**LARCHFIELD CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 8677.

United States District Court
D. Connecticut.

April 29, 1965.

John L. Calvocoressi, Pelgrift, Dodd & Stoughton, Hartford, Conn., Goldstein, Judd & Gurfein, New York City, Silverson & Gelberg, New York City, for plaintiff.

Howard Moskoff, Asst. U. S. Atty., New Haven, Conn., C. Moxley Featherston, Chief, Review Section Tax Division, Department of Justice, Washington, D. C., for defendant.

CLARIE, District Judge.

In this action, the plaintiff corporation seeks to recover federal corporate income taxes alleged to have been overpaid by two predecessor corporations, for the fiscal years ending December 17, 1948, June 30, 1949, and June 30, 1950. While this suit has been brought in three counts, only the first remains to be decided; the second and third counts having been disposed of by a partial summary judgment.

This Court adopts a part of the factual résumé incorporated in said summary judgment, Larchfield Corporation v. United States, D.C., 203 F.Supp. 821 (Anderson, J.); it reads:

"On or about November 19, 1946, Bernard R. Armour was the major shareholder of The Aspinook Corporation, hereinafter referred to as Old Aspinook. Armour had also acquired 50% of the stock of The Lawrence Print Works, Inc. (Lawrence) and 50% of the stock of Arnold Print Works, Inc. (Arnold); the balance of the stock of both corporations was owned by Old Aspinook. Lawrence, Arnold, and Old Aspinook each owned ⅓ of the stock of Union Bleachery, Inc.

The stockholder's derivative suit was brought in November, 1946, against Old Aspinook, Lawrence, Arnold, Bernard Armour, and other officers and directors of the corporate defendants, in the Supreme Court of the State of New York, and a similar suit was instituted in the United States District Court for the Southern District of New York.

Thompson et al. v. Armour et al., Supreme Court of the State of New York, County of New York, 68 N.Y. S.2d 475; Samuel Thompson v. William Broadfoot, et al., U. S. District Court, Southern District of New York, December 5, 1946, Civil No. 39–137.

The state court case is the only one which needs to be considered here. The complaint, as amended, alleged five causes of action. These were:

1. Armour caused Aspinook to make a gift to him of a 50% interest in the Lawrence Print Works, Inc.

2. Armour caused Aspinook to make a gift to him of a 50% interest in the Arnold Print Works, Inc.

3. Armour caused the corporate defendants to buy from other corporations in which he was interested at exorbitant prices and to sell to them at inadequate prices.

4. Defendants caused the corporate defendants to adopt bonus plans, which resulted in excessive payments to Armour and other individual defendants.

5. Defendants deprived Aspinook of the opportunity of acquiring Union Bleachery, Inc. by causing the same to be purchased by Aspinook, Lawrence and Arnold in equal shares.

By way of relief, plaintiffs sought to have a trust impressed in favor of Old Aspinook on any shares of stock in Lawrence and Arnold, owned by Armour, or for an accounting of the proceeds of any sale or disposition of such shares made by him; to require an accounting by all defendants, other than Old Aspinook, for their profits and for damages sustained by Old Aspinook as a result of the wrongs alleged in the complaint; and to award plaintiffs the cost and expenses of the action, including reasonable counsel fees.

As stated above, the parties, on June 4, 1948, entered into a stipulation of settlement which provided for a disposition of all of the issues in the case. The court appointed a Referee, Hon. J. Edward Lumbard, Jr., who held hearings and submitted a comprehensive report recommending court approval of the proposed settlement.

The stipulation of settlement provided that Old Aspinook, Lawrence, and Arnold would be consolidated into New Aspinook, which was to be created for this purpose. Armour agreed to receive 102,000 shares fewer than the 388,000 shares in the new corporation which he would otherwise have been entitled to under the terms of the consolidation. Though not a part of the stipulation for settlement, Armour agreed to forego any right to any bonus from the three corporate defendants for the fiscal years ending June 30, 1947 and June 30, 1948. These bonuses would have totalled $266,-000. Old Aspinook also agreed to pay any expenses which might be assessed against it by the court, including fees of attorneys and accountants for the plaintiffs and the costs of the referral.

In November, 1948, the Supreme Court of New York, after notice and hearing, approved the report of the Referee and the proposed consolidation and ordered that the suit be dismissed on the merits upon completion of the steps agreed to be taken to effectuate the settlement. In addition, New Aspinook was ordered to pay attorneys' and accountants' fees aggregating $355,692.83. The consolidation was effected in December, 1948, and the suits in both the state and federal courts were dismissed."

So that this record may disclose a complete summary of the history of the three corporations, Aspinook, Lawrence, and Arnold, the Court will look to the

Referee's report,[1] as well as the facts proven at the trial. That report disclosed that there was no evidence to support the third cause of action in the stockholders' derivative suit and none was offered at this trial; the Court thus finds that this claim is without merit. The Referee also found that there was no evidence to sustain the fifth cause of action and none was offered at this trial; the Court concurs that it was without merit.[2] The Court, however, will review claims 1, 2, and 4 insofar as they are relevant and to help determine and evaluate what occurred between Armour and New Aspinook by virtue of the compromise settlement.

The basic issue to be determined by this Court is whether or not the proceeds of this settlement of the stockholders' derivative action resulted in taxable income to The Aspinook Corporation (New Aspinook) in its fiscal year ending June 30, 1949. In deciding this question of income, it must be determined first whether or not the settlement of the action resulted in a repayment of corporate bonuses previously paid and deducted for tax purposes by Old Aspinook and its subsidiaries, Lawrence Print Works, Inc., and Arnold Print Works, Inc. If taxable income resulted from this settlement, it must then be determined, to whom it is chargeable and in which fiscal year. The parties have agreed that should the Court find for the plaintiff in whole or in part, the amount of the judgment will be determined by a subsequent agreement of the parties, with the approval of the Court.

## THE ASPINOOK CORPORATION a/k/a "OLD ASPINOOK"

The plaintiff's predecessor, The Aspinook Corporation, hereinafter referred to as "Old Aspinook", was incorporated and organized under the laws of the State of Delaware, on February 1, 1938, for the purpose of operating a textile mill in Jewett City, Connecticut. The principal promoter of this enterprise was Bernard R. Armour. He received 46,250 shares in the new corporation for his organizing services; these shares together with those he bought for himself and for a family trust, gave him control at that time of 89,084 shares. This was 48% of the 184,750 shares issued; these together with the shares held by the other directors controlled substantially more than 50%, 108,117 shares. By November 19, 1946, Armour's personal holdings had been reduced to 56,052 shares, approximately 31.6%.[3] Armour himself selected all of the original board of directors and the managing executives of the company. While he remained only a director, he was generally recognized as the corporate guiding force, until his resignation on July 24, 1947, while the stockholders' derivative suit was pending.[4]

## ACQUISITION OF LAWRENCE PRINT WORKS, INC.

Prior to August 15, 1941, Armour learned of the opportunity to purchase a textile print works in Lawrence, Massachusetts. He advised Aspinook's management of the availability of this plant, but it was claimed they were without adequate funds or credit at that time to arrange financing. Thereupon, Armour offered his personal credit to assist in the acquisition of the plant. On August 15, 1941, the purchase agreement was executed and the down-payment of $100,000 was advanced by Armour to a newly formed Delaware corporation to be known as Lawrence Print Works, Inc., which had been organized August 14, 1941 for that purpose.[5]

At a meeting of the Old Aspinook executive committee on August 14, 1941, a resolution was adopted which indicated the intention of the parties as to ownership at that time. The vital part reads: "Whereas, said The Lawrence Print

---

1. Plaintiff's Exhibit "D".

2. Defendant's Exhibit "3", Referee's Affidavit, p. 3.

3. Supra note 1, at 9.

4. Supra at 10.

5. Supra at 14.

Works, Inc., is and is to be a wholly owned subsidiary of Aspinook. * * " At that meeting, the directors authorized the purchase of the Lawrence properties for $500,000. The original down-payment advanced by Armour was treated as a loan to Lawrence and the latter gave him a corporate demand note of $100,000 bearing interest at 6%, secured by one (1) share of Aspinook stock. It was agreed that no further stock would be issued by Lawrence except with Armour's consent, until the note was paid.[6]

At the annual stockholders' meeting of Aspinook on September 17, 1941, the president, Mr. Broadfoot, reported to the stockholders that the resolution ratifying all the acts of the directors, the executive committee, and officers, included a contract negotiated by the directors relating to the acquisition of the print works at Lawrence. A vote on the resolution disclosed that a small minority of the stockholders dissented. However, Aspinook's annual report for the year ending June 30, 1942, revealed that Aspinook owned only 50% of the capital stock of the Lawrence Print Works, Inc. No public disclosure was made of Armour's[7] interest of 50%, until demand was subsequently made in October, 1946, by an attorney for the dissident stockholders.

In order to close the Lawrence purchase on December 12, 1941, Aspinook and Armour each advanced $125,000; and in addition to this, Armour had on August 20, 1941, advanced $25,000 as working capital. For the $125,000 advanced by Aspinook, Lawrence gave Aspinook its note at 4%; and for Armour's share, he received a note at 6% per annum. Lawrence fully repaid these notes to Armour and Aspinook by 1944.

Sometime after December 13, 1941, either in late December or in January, 1942, an agreement was executed be-tween Aspinook, Lawrence, and Armour which bore a date indicating "an ex post facto" act on the part of the participants, in that it was dated, "as of the 18th day of August, 1941."[8]

This pre-dated agreement recited Armour's loan to Lawrence of $100,000 with which the down-payment had been made and for which he had received a note bearing 6% interest; this note was secured by a pledge of Aspinook's stock in Lawrence. It also recited how Armour had agreed to contribute $125,000 in cash, $25,000 in dyestuffs, and to loan or cause to be loaned to Lawrence, on behalf of Aspinook, or to Aspinook directly, such further sums as might be required for the purchase.

This agreement went on to state that Aspinook and Armour were "joint ventures" and that the newly acquired realty should be divided; Lawrence to take the Print Works as a "wholly owned subsidiary of Aspinook;" the remaining realty to belong to Armour. It recited that Lawrence's contribution was $350,000 and Armour's $150,000. The note which Armour held of Lawrence, would be cancelled upon his acquiring title.[9]

On December 12, 1941, when the documents of sale were delivered by the seller, Pacific Mills, to Lawrence, the principal consideration tendered, subject to minor adjustments, provided that the latter gave Pacific its note for $250,000 due November 15, 1942, with interest at 6%; a note to Pacific for $25,000 to be paid by procuring dyestuffs from Pacific within one year; a purchase money mortgage on the buildings and equipment for $275,000 to secure the two aforesaid notes and $125,000 in cash.[10] Lawrence was enabled to pay the cash by reason of two bank loans. Armour advanced no part of the cash payment, but did obligate himself to furnish the $25,000 worth of dyestuffs.

While Lawrence furnished the entire consideration for the purchase price of

6. Supra at 16.
7. Supra at 17.
8. Supra at 18.
9. Supra at 19.
10. Supra at 17.

$500,000, amounts actually advanced and obligations assumed in money and dyestuffs for this purpose at the time of closing other than the purchase money mortgage, included $125,000 loaned by Aspinook and $125,000 loaned by Armour to Lawrence. In addition, Armour did advance $25,000 in cash on August 20, 1941 for use as working capital during the interim operating period.[11] Lawrence gave its notes to Aspinook and Armour respectively for the money loaned; Armour's interest rate was 6%, while Aspinook's was only 4%.

At a meeting on January 29, 1942, the board of directors of Aspinook, adopted a resolution approving the execution of the "as of August 18, 1941" agreement. While Armour appears to have been present, the minutes stated that he did not participate.[12] Then an agreement by letter, dated March 31, 1942, among Aspinook, Lawrence, and Armour, cancelled the agreement dated "as of August 18, 1941." Aspinook agreed to assume one-half of Armour's obligations, to contribute $25,000 in dyestuffs, and to issue to Armour one-half of the entire authorized capital stock of Lawrence for a nominal consideration not stated. It was agreed that Aspinook and Armour would each continue to be creditors of Lawrence for $137,000 plus interest with respect to the amounts contributed toward the purchase price of Lawrence.

The Lawrence directors, who were also the controlling directors in Old Aspinook, ratified this new agreement of March 31, 1942 at their next meeting on May 28, 1942, and directed the issuance of the stock to Armour at $1.00 per share. The minutes disclose that Armour did not vote or participate in the discussion. The next meeting of the directors of Old Aspinook on October 8, 1942, ratified the March 31, 1942 letter-agreement; Armour is recorded as silent and not voting. On June 9, 1942, Lawrence had issued to Armour 500 shares of its common stock (one-half of the total outstanding shares) for $500.[13]

The Referee, in his findings certified to the State court, and expressed his opinion that if the matter were tried, a court would find that the Lawrence opportunity was fairly offered to Aspinook and that the latter could not have availed itself of it, without Armour's help. He advanced the further opinion that the opportunity was fairly divided and that the defendant directors acted in good faith and well within the proper limits of their sound business judgment.[14]

### ARNOLD PRINT WORKS, INC.

Pursuant to the authority granted at the executive committee meeting on May 28, 1942, the president of Aspinook executed an agreement with the Beacon Industrial Corporation to operate the Jones Division of the Arnold Print Works, in North Adams, Massachusetts, on a basis of sharing profits equally. Beacon, a liquidating company had at that time just acquired the plant.[15]

On June 30, 1942, Aspinook's president signed a letter-agreement with Beacon to purchase the plant and Aspinook gave the seller its check for $50,000 to secure the deal. Thereafter, on July 7, 1942, Arnold Print Works, Inc., a Delaware corporation, was organized and resolutions adopted authorizing the acquisition of the Jones Division by Arnold for $850,000. The president was authorized to execute notes in the amount of $625,000 and to make payment of cash in the amount of $175,000. A separate resolution acknowledged that Aspinook had paid the seller $50,000 on the purchase price and that Arnold should issue 500 shares to Aspinook in payment therefor.[16] It was also voted that all of the remaining 2,000 shares to be issued, should be sold to Aspinook at $100.00 par value for cash.

At a meeting of the Aspinook executive committee, the same date, the di-

11. Supra at 18.
12. Supra at 19.
13. Supra at 20.

14. Supra at 22.
15. Supra at 26.
16. Supra at 27.

rectors approved the acquisition of the 500 shares for the sum of $50,000, which sum it had previously advanced in behalf of Arnold as the down-payment on Arnold's purchase from Beacon. The directors also voted to authorize Aspinook to purchase the remaining 2,000 shares at par value for cash. Thereafter, on July 28, 1942, the purchase was concluded by Arnold delivering to Beacon, Aspinook's check for $175,000; and Arnold's note to Beacon for $625,000 secured by a purchase money mortgage on the property.[17]

On July 24, 1942, a bank loaned Aspinook $250,000 on a note endorsed by Armour. Only $150,000 of this was new money since the $50,000 balance on the December, 1941 Lawrence Print Works, Inc. loan and the $50,000 interim loan made on June 30, 1942, were consolidated into a single loan on this $250,000 note of Aspinook endorsed by Armour.

With this money, on July 28, 1942, Aspinook paid Beacon $175,000 and paid into Arnold $25,000, a total of $200,000 for which Arnold issued to Aspinook its remaining 2,000 shares of common stock. Thus Aspinook enabled Arnold to pay the $225,000 required by the contract with Beacon and for this total advance, it received all of the 2,500 authorized shares of Arnold's common stock. At the stockholders' meeting on September 15, 1942, according to the minutes, no report or mention was made of this Arnold transaction. The Arnold directors approved the foregoing transaction on October 7, 1942, as did the Aspinook directors on the following day.

It was not until October, 1942, that defendant-director Swiger, an attorney, discovered that the minute book contained no minutes of the June 12, 1942 Aspinook executive committee meeting. He instructed an assistant to write up the minutes for that day, so as to reflect what he claimed had been agreed to.[18] It should be noted that the minutes of the previous executive committee meet-

ing of May 28, 1942, contained nothing to substantiate the statement in the ex post facto prepared minutes of June 12th, as to what transpired at the earlier meeting. These belated minutes of June 12, 1942, stated that Armour reminded the members of the board, that when this matter was previously discussed at the last meeting of the executive committee, he had disclosed the opportunity to purchase the plant from Beacon and had offered Aspinook the privilege of taking all or any part of the deal.

These minutes represented further that a general discussion ensued relative to the lack of financial ability of Aspinook to finance this purchase. It was agreed that the funds required to effect the purchase should be borrowed from a bank and the notes endorsed by Armour personally. As part of the consideration for Armour's endorsement, the equity in the new corporation, Arnold was to be split half and half between Aspinook and Armour.[19]

On March 11, 1943, the Aspinook directors met at 1:00 P.M. and the Arnold directors at 2:30 P.M. The organization of Arnold was reviewed and the minutes reveal again that Aspinook was enabled to purchase Arnold, because of the credit extended to Arnold by Armour. All of the common stock of Arnold, however, had been previously issued solely in Aspinook's name and up to that time no correction had been made.[20] The bank officials who participated in Aspinook's financing problems prior to November 27, 1942, indicated that their records disclosed Arnold was a wholly owned subsidiary of Aspinook.

At this meeting, a recapitalization of Arnold was proposed and adopted. This provided that $100,000 of first preferred stock held by Beacon would continue; in exchange for 2,500 shares of common stock held by Aspinook, Arnold would issue $250,000 of second preferred stock; and 1,000 shares of new common stock would be issued, 500 shares to Aspinook

17. Supra at 28.
18. Supra at 30.
19. Supra at 31.
20. Supra at 32.

for $500, and the remaining 500 shares to Armour for a similar sum. On May 20, 1943, by Certificate of Amendment of the Certificate of Incorporation of Arnold, the authorized capital stock of the company was reclassified and on June 1, 1943, the 500 shares each to Aspinook and Armour were issued. About the time this action took place, Arnold's income statement for the year ending June 30, 1943 showed earnings before taxes of $1,014,367, and after taxes of $279,-000. The first disclosure to the stockholders of Armour's one-half interest in Arnold was contained in the annual report for the year ending June 30, 1946, which was sent out in November, 1946.[21]

The Referee expressed the opinion in his report that a trier of the facts would probably find that the transfer to Armour of one-half of the common stock for $500 in June, 1943, amounted to a gift of corporate assets. He found further that if the action were tried, the trial court would impress a trust upon those 500 shares of Armour's for the benefit of Aspinook and compel Armour to return this stock to Aspinook.[22]

## THE BONUS PLANS

The fourth cause of action, in the stockholders' derivative suit, alleged that all of the defendants, including Armour, caused Aspinook to adopt a bonus plan and thereafter caused Lawrence and Arnold to adopt similar bonus plans, each of which provided excessive and unreasonable compensation to Armour and his colleagues. This claim alleges a general dereliction of duty and resultant damage for which an accounting was asked.

Each of the bonus plans provided that 10% of the corporate net profits before taxes should be set aside for bonus payments. The Aspinook plan was adopted by the board in June 1941 and the Arnold plan by its board, in June 1943. Both resolutions named the participants and the percentage amounts which each was

to receive. The Lawrence plan was adopted by its Board in June 1942; the resolution named the participants, but the amounts to be received were to be determined by the officers. Under the Aspinook and Lawrence plans, Armour and President Broadfoot each received 35% of the 10% fund. The plans were adopted at Armour's suggestion and he passed upon the participants and the share each was to receive.[23]

Armour received no salary from any of the corporations. None of the directors or officers who participated in the plans received a salary from Lawrence. The salaries which the officers received from Arnold were nominal. The largest salary ever paid to an officer of Aspinook was $12,000 which President Broadfoot received in 1943–1946.

A majority of the directors who voted for the adoption of the Aspinook and Arnold bonus plans participated in them. The majority of the directors who voted for the Lawrence plan were not participants. The stockholders were never formally notified, either in the annual reports or otherwise, of the plans, even though a minority stockholder of Aspinook requested in 1941 that stockholders be given full information regarding them. At the annual meeting of stockholders, it was customary to propose a resolution ratifying and approving all acts and transactions of the officers and directors, including those transactions in which the officers and directors had an individual interest. These resolutions were, of course, always passed since Armour and his group voted the controlling stock.[24] The enactment of the bonus plans and the manner in which they were given effect, were in the case of all three corporations marked with an informality not consistent with good corporate procedures. Those who devised the formulae for payment of bonuses were in all instances participants in the benefits. Indeed, in the Aspinook

21. Supra at 33.
22. Supra at 38.

23. Supra at 41.
24. Supra at 43.

and Arnold plans, the presence of participating directors was necessary to constitute a quorum.[25]

No dividends whatsoever were paid to the holders of common stock, although under the inflexible bonus plan, payments to Armour from the three companies increased from $11,000 in 1941 to $95,000 in 1946.[26]

The Referee had little difficulty with respect to payments made to any of the directors and officers, with the exception of Armour. Payments to Armour were difficult to justify. He was not an officer of any of the corporations, nor was he under a formal contract of employment. He was designated a consultant and adviser to Old Aspinook by a vote of the board of directors on September 20, 1944. He was not bound in any formal contractual manner to perform any services other than those of a director, and it is clear that he was not entitled to the money received simply by virtue of his services as a director. Since he was interested in between fifteen and twenty other corporations, it is difficult to believe that he could have spent any considerable part of his time in performing services for these three corporations.[27]

The bonus payments made to Armour hereinafter outlined were: $11,000 in 1941 and 1942; $32,000 in 1943; $48,000 in 1944; $59,000 in 1945; and $95,000 in 1946. These increased payments to him resulted in a large measure, from the inflexibility of the bonus plans, and demonstrate the disadvantage of establishing a fixed fund as high as 10% before taxes for the distribution of bonuses, and the impropriety of fixing, for years in advance, a specified percentage to be received by the participants.

Although the size of the payments made to Armour in the latter years raises a real question, in view of the services which Armour rendered, the success achieved, and considering all of the circumstances, I believe it is unlikely that a court, on the trial of the suit, would hold that the amounts paid to him were so great as to constitute a misuse or a waste of corporate funds.[28]

Of the five causes of action, only one, namely, the second cause of action with respect to Arnold Print Works, Inc., appeared to the Referee to have sufficient merit to warrant the belief that the plaintiffs would probably prevail at the trial.[29]

### DISCUSSION OF MERITS

The plaintiffs' state court action was directed against The Aspinook Corporation and all of its directors and officers, its two subsidiaries, Lawrence Print Works, Inc. and Arnold Print Works, Inc., together with their officers and directors. The settlement, insofar as it concerned the exchange of material consideration between the parties, was solely between the individual defendant, Bernard R. Armour, and the plaintiffs. Not one of the other defendants, except Armour, was required to concede, give up, or compromise anything of value.

Upon the terms of the stipulation of settlement of June 4, 1948, Mr. Armour was required to turn in all of the common stock that he owned in The Aspinook Corporation, the Lawrence Print Works, Inc., and Arnold Print Works, Inc., and to receive in lieu thereof new stock in a new corporation identified as The Aspinook (New Aspinook). Furthermore, in lieu of receiving all of the stock in New Aspinook that he would have been entitled to, had there been no settlement, he would receive and accept 102,000 shares less than he would have otherwise received beyond the value of the stock which he had heretofore held in the three named corporations. Thus, the new corporation was enriched and benefited to the extent of the value of the 102,000 shares, which he relinquished in the new merged corporation. What was the na-

25. Supra at 44.

26. Supra at 46.

27. Supra at 47.

28. Supra at 48.

29. Supra at 54.

ture of this enrichment; was it in settlement of only one of the causes of action or was it apportioned among the several claims or counts in the action, and if so, in what proportion? Neither the stipulation of the parties, the Referee's report, or the state court's approval of the settlement made any specific findings in this regard.

When the new corporation filed its federal income tax return for the fiscal year ending June 30, 1949, plaintiff's Exhibit "L", Schedule A, included under "Other Income" the following item:

> "Recovery of compensation
> previously paid
> $259,299.65"

It is significant to note that the total amount of the questionable bonuses voted and received by the defendant, Armour, during the period 1941 through 1946, from the three corporations amounted to exactly this sum, $259,299.-65. It represented the amount of bonus monies previously paid to Armour by old Aspinook, Arnold, and Lawrence, as set forth in plaintiff's Exhibit "D", pages 42 and 43; it had been deducted by each of the aforesaid corporations in computing their respective taxable income during the fiscal periods of payment and it had resulted in prior tax benefits to them.

The plaintiff went further in confirming its intended treatment of this bonus item as one of the vital issues compromised and settled in the state court law suit. The legal fees and expenses amounted to $345,692.83; and New Aspinook agreed that it should pay such of these fees and expenses as were assessed by the Court.[30] The plaintiff corporation apportioned the legal fees attributable to the preservation and perfection of title to the capital stock assets, as distinguished from that attributable to an accounting for money damages, for breach of fiduciary responsibility.[31]

In so doing, the plaintiff included not only the total bonuses paid to Armour, $259,299.65, but also added to it the bonuses of the two subsequent fiscal years ending June 30, 1947 and 1948, amounting to $266,000. Any claim to this latter sum was waived by Armour and it was considered to be a benefit to the plaintiff corporation even though it was not contained in the formal stipulation of settlement. The total sum of these items, $525,299.65, was determined to be the total corporate benefit in arriving at that portion of the values attributable to other than capital benefits represented by the 102,000 shares surrendered. Its percentage was computed to be 25.6119% ($88,538.50) of the total sum for legal fees of $345,692.83; this percentage computation was determined in arriving at the allowable income tax deduction for attorneys fees.[32] All of the foregoing computations were arrived at, after extensive discussions between responsible corporate personnel, expert tax accountants and outstanding corporate legal counsel, who were specialists in their field.[33] This plan of action evidenced a considered and calculated policy, determined at a time proximate to the transactions, which best disclosed the true merit of the issues between the parties. It constituted an admission made by the taxpayer under oath on its tax return.

> "In general * * * (a) written statement by, a party to a tax proceeding which constitutes an admission against his interest and tends to establish or disprove any material fact in the case is competent evidence against him * * *." 47 C.J.S. Internal Revenue § 675.

> "The Commissioner's finding in this respect was based upon decedent's admission under oath. The finding of the Board of Tax Appeals was, in effect, a holding that the testimony of * * * was not sufficient to overcome decedent's admission."

30. Plaintiff's Exhibit "C".

31. Defendant's Exhibit "4", sub-para. 5.

32. Defendant's Exhibit "4".

33. Tr. 295, 309.

Rusk v. Commissioner of Internal Revenue, 53 F.2d 428, 432 (7 Cir. 1931). See Jackson Iron & Steel Co. v. Commissioner of Int. Revenue, 54 F.2d 861, 862 (6 Cir. 1931). "The only evidence on which the corporate petitioner relies to avoid its admission made under oath in its return, is that it immediately on receipt of the notes, transferred them to its stockholders. This was insufficient." Cherokee Motor C. Co. v. Com'r of Internal Revenue, 135 F.2d 840, 841 (6 Cir. 1943).

While the plaintiff's accountant testified as to his intention to file a claim for refund following the filing of the income tax return for the fiscal year ending June 30, 1949, it is significant to note that none was promptly filed. It was not until after the Government gave a notice of further assessment on January 15, 1957,[34] that the plaintiff filed its claim on December 27, 1957;[35] eight and one-half years after the termination of the fiscal tax year. At that time, several of the principals concerned were deceased;[36] particularly Armour and Swiger, the latter being instrumental in formulating the basic pattern for the compromise settlement. Neither party offered any evidence related to the personal tax returns of Armour, the man who purportedly returned the $259,299.65 in bonuses for the period affected. His treatment of the item might have indicated his intention, as reflected in the settlement. If it exists, it could have been subpoenaed by either party; no inference will be drawn by the Court.

The Referee in referring to Armour's bonuses stated in his report:

"The enactment of the bonus plans and the manner in which they were given effect, were, in the case of all three corporations, marked with an informality not consistent with good corporate procedure. * * * Those who devised the formulae for payment of bonuses were in all instances participants in the benefits. Indeed, in the Aspinook and Arnold plans, the presence of participating directors was necessary to constitute a quorum." (Plaintiff's Exhibit "D", p. 44.)

"Payments to Armour, however, are more difficult to justify. He was not an officer of the corporations. Nor was he under a formal contract of employment with any of them. * * * He was, however, designated 'consultant and adviser to the corporation' (Aspinook) by a vote of the Board of Directors on September 20, 1944. He was not bound in any formal contractual manner to perform any services other than those as a director, and it is clear that he was not entitled to the money received simply by virtue of his services as a director. * * * Since he was interested in between fifteen and twenty other corporations * * *, it is difficult to believe that he could have spent any considerable part of his time in performing services for these three corporations." (Plaintiff's Exhibit "D", p. 47.)

The Referee further stated:

"Although the size of the payments made to Armour in the latter years raises a real question, in view of the services which Armour rendered, (advisory executive and administrative ability) the success achieved, and considering all of the circumstances, I believe it is unlikely that a court, on the trial of this suit, would hold that the amounts paid to him were so great as to constitute a misuse or waste of corporate funds." (Plaintiff's Exhibit "D", p. 48.)

While the validity and merit of the bonus plans were not squarely in issue in the summary judgment proceeding

---

34. Plaintiff's Exhibit "F".

35. Plaintiff's Exhibit "H".

36. Armour died on December 1, 1949 (Tr. 130); Swiger died on August 21, 1960 (Tr. 129).

(Anderson, J.), it is significant to note his observations on that issue:

"The only other cause of action which appears to have had any substance to it was the fourth, concerning bonuses. The referee found that some of the bonus plans were voidable." Larchfield Corporation v. United States, 203 F.Supp. 821, 825 (D.Conn.1962).

"It may be that some of these claims were made more hopefully than confidently, and the course of the litigation and settlement show that there was little reason to give validity to the effort to recover damages except in connection with some of the bonus plans." Id. at 828–29.

In another instance, he commented:

"On the stronger facts of this case where the dominant purpose of the derivative action was the restoration of title to shares of stock but at least one other less dominant and less substantive purpose was present. * * *" Id. at 829.

The Referee's findings, while helpful, are not conclusive on the first and fourth counts;[37] they were not the product of a courtroom adversary proceeding. The examination of witnesses and the search for truth was accomplished through direct examination of witnesses by the Referee and the offering of testimony and exhibits taken on examinations by counsel before trial, together with the testimony of several accounting and appraisal witnesses. Some of these were director-defendants, whose testimony would naturally have attempted to justify their acquiescence in policies adopted by the board in order to protect themselves on the charges of breach of fiduciary duty. The state court's approval relied almost wholly on the Referee's report except that certain phases of the report were argued by an objector.[38] The court's ultimate approval was based upon the Referee's finding that the compromise was fair under the existing circumstances. Since all the litigating parties had agreed on the compromise, it was the purpose of all to cooperate, and those who were former adversaries, to offer helpful testimony to assure the court's approval and ratification. Thus, any analysis of the weight to be given the conclusions in this report must give consideration to the purpose and circumstances under which it was accomplished.

The plaintiff's only witness at the trial in this Court was Attorney Joseph R. Kelley, of the law firm of Swiger, Chambers, Kelley and Harragan, who participated in stockholders' derivative suits in the New York Supreme Court and the United States Court for the Southern District of New York and whose firm received a fee of $50,000, for services rendered in the case. He testified that his firm originally represented Armour and the Aspinook Corporation in the acquisition of Lawrence and Arnold. However, during the course of this litigation, Armour retained separate counsel in the person of Herbert G. Brownell and his partner, Thomas F. Daly, of Lord, Day & Lord, and Mr. Kelley ceased to represent him.[39] He testified, however, that he continued to function as coordinator of all defense counsel; and in this capacity, he claimed that he was authorized by all counsel to speak for the defense.[40] While he claimed to represent all defendants at the Referee's hearings and the court hearing on the Referee's report, the record on the latter indicates minimal actual participation.[41]

He testified that at the time the action was pending, he regarded the merits of the bonus issue as being without value.[42] He did admit indirectly that it was considered.

"There was another point I made with Paulson (plaintiff's counsel) in my talks with him, that even if he did upset the bonus causes of action,

37. Defendant's Exhibit "3", p. 3.

38. Supra note 37, at 14.

39. Tr. 101.

40. Tr. 106.

41. Supra note 37, at 2, 60.

42. Tr. 113.

he would still have to face the claim of the defendants for compensation on quantum meruit * * *." (Tr. 116).

While Kelley's testimony claimed that no consideration was given to the bonus issue in determining the amount of shares that Armour was to turn back or the value of those shares,[43] this Court finds that his testimony is not persuasive and is entitled to little weight. Swiger, of his law firm, not Kelley, was the counsel present when the final settlement formula and agreement was made on the eve of trial. Kelley admitted that he did not have authority to bind Armour in the type of settlement that was finally determined.[44]

Kelley could remember clearly that after a date in early March, 1948, Scovell, Wellington & Company, a nationally known firm of certified public accountants and management consultants, worked with his firm in working out the details of the plan of consolidation.[45] But he could not remember whether or not he had given the firm any information for their use in the preparation of the June 30, 1949 tax return.[46] He did admit attending a conference in January, 1949, at which a Mr. Frutkin, (then of Wilson, Frutkin & Waldie) was present. Frutkin was a special tax consultant retained by Armour, both for himself and Aspinook[47] to advise on the tax problems of the state court settlement. Kelley further admitted that he had expressed no objection to reporting the $259,299.65 on the income tax return as a restoration of income.[48]

Notwithstanding Kelley's failure to recall these crucial facts, the memorandum from Mr. Johnston, dated August 11, 1949, setting out the treatment of the tax issues,[49] clearly confirmed that there had been multiple and extensive conferences and correspondence between Kelley, Johnston, and Frutkin concerning this subject.[50] The ultimate tax treatment was subsequently verified in the memorandum from Norcross dated September 13, 1949.[51]

While it may be contended that Armour's giving up of all the bonus payments received by him during this period is not realistic, it must be recognized that in settling the overall issues in suit and weighing the final result, Armour ended up in a very strong position. It might even be argued that he was better off after the settlement than he was before. Originally, when the suit commenced, he owned 31.6% of the voting stock in Old Aspinook; he owned 50% of Arnold; and 50% of Lawrence. After the settlement, and the giving up of the 102,000 shares so-called, he then owned 51.08% of the voting stock in the newly merged corporation. The value of such control embodied in a block of stock controlled by one individual, for practical corporate purposes, actually increased the unit value of his shares. Thus, it could be argued that Armour was better off after the settlement, than he was prior to it. Having this in mind, it is not unusual that he should agree as a part of the overall settlement to restore these questionably voted bonuses.

Both parties substantially agree on the principle that if the settlement did embody the return of bonuses previously paid for which tax deductions were allowed, then it is income to the corporation.[52] See Rothensies v. Electric Bat-

---

43. Tr. 125.

44. Tr. 137.

45. Tr. 154.

46. Tr. 162, 163, 172, 174, 175.

47. Frutkin billed Armour for $7,500.00, and Aspinook for $5,000.00 for his services. Defendant's Exhibit "5", p. 2.

48. Tr. 183.

49. Defendant's Exhibit "6", pars. 2, 3, 5, 6, 9.

50. Defendant's Exhibit "5", pp. 3, 4, 5; Tr. 297.

51. Defendant's Exhibit "4", pars. 1, 2, 3, 4, 5.

52. Tr. 25.

tery Co., 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946).

This is not the type of case where the Court could on its own initiative measure and evaluate by approximation the relative values involved, without completely substituting unrealiable speculation and guesswork for material proof. See Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66, 67, 62 S.Ct. 925, 86 L.Ed. 1266 (1942).

The plaintiff has failed to uphold its burden of proof that the amount of $259,299.65 which Armour received as bonuses for the years ending June 30, 1941 through 1946 was erroneously treated as taxable income on the plaintiff's corporate return for the fiscal year ending June 30, 1949.

> "Obviously the burden was on the plaintiff, in order to establish a basis for judgment in his favor, specifically to show not merely that the assessment was erroneous but also the amount to which he was entitled." Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935).

> "Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid." Id. at 515, 55 S.Ct. at 291.

> "They (the taxpayers) also had the burden of proving what portion, if any, of the amount received in settlement of the litigation in question constituted non-taxable income. * * * This, they did not do." Carter's Estate v. C. I. R., 298 F.2d 192, 195 (8 Cir. 1962).

> "In order to carry its burden of proof, petitioner must do more than merely claim alternative designations for what it recovered—it must prove a designation so that some orderly tax treatment may be accorded it." Sager Glove Corporation v. C. I. R., 311 F.2d 210, 211 (7 Cir. 1962):

> "His (the Commissioner's) ruling has the support of a presumption

of correctness, and the petitioner has the burden of proving it to be wrong." Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). See Law of Federal Income Taxation (Mertens) Vol. 9, § 50.61; Peerless Ins. Co. v. C. I. R., 80 F.2d 427, 429 (9 Cir. 1935).

The plaintiff finally submits that if any income was reportable by reason of the bonus issue, it was not reportable in the fiscal year June 30, 1949. Its claim is based on the fact that any appeal from the New York Supreme Court's ratification and approval of the settlement expired December 10, 1948; and the income, if any, accrued at that time and was reportable in the then current fiscal year of the corporations affected. The existence of the new corporation, New Aspinook, did not commence until December 18, 1948, and therefore it could not have received reportable income prior to its existence.

However, the stipulation of settlement, Plaintiff's Exhibit "C", Paragraph 4, provides:

> "If and when the Court shall judicially determine that the settlement provided for herein is fair, the consolidation of Aspinook, Lawrence and Arnold, hereinabove provided for, shall be approved in the manner required by law at meetings of the stockholders of Aspinook, Lawrence, and Arnold duly convened and held. At such stockholders meetings Aspinook and Armour will vote the stock of Lawrence and Arnold owned by them in favor of such consolidation and Armour and the other individual defendants, owning or controlling the voting power of more than a majority of the issued and outstanding common stock of Aspinook, will vote in favor of such consolidation."

It is apparent that the parties contemplated the requisite approval by the Court and the expiration of the appeal time, before convening a meeting of the stockholders of the several corporations to approve, ratify, and adopt the plan.

The intention of all parties is obvious, that the repository, New Aspinook, resulting from the consolidation of the several corporations, would become the recipient and beneficiary of the income derived from a return of the bonuses, coincident with the merger. This income is taxable for the corporate fiscal year in which it was received and benefited ending June 30, 1949.

Judgment is hereby entered for the defendant, United States of America. So ordered.

The Findings of Fact and Conclusions of Law, in accordance with Rule 52(a), Fed.R.Civ.P., are attached and incorporated herein by reference as Appendix "A".

### APPENDIX "A"
### FINDINGS OF FACT *

1. On October 31, 1949, the taxpayer's predecessor, The Aspinook Corporation, hereinafter referred to as New Aspinook, filed its corporate income tax return for the fiscal period ending June 30, 1949. (Exhibit "L"; stip. par. 18). On Schedule A of that return, under the heading, *Other Income*, New Aspinook reported the following item:

| | |
|---|---|
| Recovery of compensation previously paid | $259,299.65 |

Similarly on Schedule M, of Exhibit "L", under the heading, *Reconciliation of New Income and Analysis of Surplus,* the following appears:

13. Adjustments for tax purposes not recorded on books:
Recovery of compensation previously paid      $259,299.65

22. * * *
Professional services attributable to recovery of compensation      88,538.50

The return was signed under oath by B. D. Lathrop, Treasurer, by W. A. Broadfoot, President, and Ernest J. Tacy of Scovell, Wellington & Company, as preparer. (Exhibit "L", p. 1.)

2. On December 27, 1957, New Aspinook timely filed a claim for refund alleging, inter alia, that the $259,299.65 was erroneously reported in income. (Exhibit "H" ; stip. par. 21.)

3. The inclusion of the sum of $259,-299.65 in income as a recovery of compensation previously paid arose out of a stockholders' derivative suit involving, among others, one of New Aspinook's predecessors.

4. On November 18, 1946, Samuel Thompson commenced a stockholders' derivative suit in the Supreme Court of the State of New York against the following named individuals and corporations:

Bernard R. Armour, William A. Broadfoot, Viggo Carlsen, E. E. Gilbert, E. F. Greene, Hamilton Pell, G. B. Schwab, R. W. Smith, Arlen G. Swiger, H. F. Young, Lawrence Print Works, Inc., Arnold Print Works, Inc., and the Aspinook Corporation. (Exhibit "A", p. 1; stip. par. 6.)

5. The complaint in the derivative suit, as amended, alleged five causes of action. These were as follows:

(a) Armour caused Aspinook to make a gift to him of a 50% interest in the Lawrence Print Works, Inc.

* (The page references in the Findings of Fact are to the Exhibit "D" pagination and not the printed pagination)

(b) Armour caused Aspinook to make a gift to him of a 50% interest in the Arnold Print Works, Inc.

(c) Armour caused the corporate defendants to buy from other corporations in which he was interested at exorbitant prices and to sell to them at inadequate prices.

(d) Defendants caused the corporate defendants to adopt bonus plans, which resulted in excessive payments to Armour and other individual defendants.

(e) Defendants deprived Aspinook of the opportunity of acquiring Union Bleachery, Inc. by causing the same to be purchased by Aspinook, Lawrence and Arnold in equal shares. (Exhibits "A" and "B".)

6. The plaintiff in the derivative suit was represented by Mr. Milton Paulson. (Exhibit "A", p. 1.)

7. Mr. Joseph R. Kelley, an attorney from the State of New York, was engaged to represent the corporate defendants and certain of the individual defendants. (Tr. 82, 83, 128.)

8. Subsequent to the time the answer was filed in the derivative suit, Mr. Herbert Brownell and Mr. Thomas Daly of Lord, Day & Lord, were designated as personal, special counsel for Mr. Armour. (Tr. 83, 128.) From that point on Mr. Kelley proceeded as though Messrs. Daly and Brownell were in fact counsel of record for Mr. Armour and Mr. Kelley's representation was limited to the corporate defendants and certain of the individual defendants other than Mr. Armour. However, Mr. Kelley continued to collaborate with the special counsel and express his opinions when they were sought by Mr. Armour's counsel. While he had authority to negotiate, he did not have authority to bind Mr. Armour in the type of settlement finally determined. (Tr. 101, 111, 129, 137.)

9. In March of 1948, when the derivative action pending in the federal court was on the eve of trial, there was a "sudden and unexpected agreement" between counsel for the plaintiff, Mr. Milton Paulson, and Mr. Swiger who was an individual defendant and Mr. Kelley's law partner, and Mr. Armour, pursuant to which the three corporations, Old Aspinook, Arnold, and Lawrence would be consolidated and Mr. Armour would give up some part of the shares of the new corporation that he would otherwise be entitled to receive. (Tr. 87, 88.)

10. Mr. Kelley was not present at the settlement conference. (Tr. 87–88.) Nor was the settlement a direct result of prior negotiations between Mr. Kelley and Mr. Paulson. (Tr. 136, 138, 139.)

11. After the settlement agreement of March, 1948, a formal stipulation of settlement was entered into on June 4, 1948. (Tr. 87, stip. par. 8; Exhibit "C".) Pursuant to the formal stipulation of settlement Old Aspinook and Armour agreed to cause the consolidation of Old Aspinook, Lawrence, and Arnold into a new corporation which will hereinafter be referred to as New Aspinook. Upon completion of the consolidation, Armour agreed to transfer to the new corporation, i. e., New Aspinook, 102,000 shares of New Aspinook. The settlement was subject to the approval of the Supreme Court, New York County. Aspinook, presumably New Aspinook, agreed to pay whatever attorneys' fees and accountants' fees were assessed against it by the court. (Exhibit "C", pars. 1, 2, 6.)

12. Prior to the consolidation of the three corporations into New Aspinook, Bernard Armour was the de facto controlling person in the three corporations (Tr. 136; Exhibit "D", p. 11). Subsequent to the consolidation, Mr. Armour owned in excess of 50% of New Aspinook. (Tr. 136.)

13. Settlement of the derivative action would have been impossible without Mr. Armour's concurrence and Mr. Kelley did not have authority to commit Mr. Armour to a settlement. (Tr. 137.)

14. On June 15, 1948, The Supreme Court for the County of New York appointed J. Edward Lumbard, Jr., as Referee to inquire on the merits into the

fairness and adequacy of the settlement and to report his opinion on whether the settlement should be approved and confirmed. (Stip. par. 9.) The Referee's report was submitted on August 27, 1948. (Stip. par. 10.)

15. Counsel for all parties to the litigation appeared before the Referee and testimony and exhibits were presented to him for his consideration. (Exhibit "D", pp. 3–4.)

16. Lord, Day & Lord, by Thomas F. Daly, appeared for the defendant, Bernard R. Armour. Swiger, Chambers, Kelley and Harragan, by Joseph R. Kelley, appeared for the defendants, G. B. Schwab, R. W. Smith, Arlen G. Swiger, Lawrence Print Works, Inc., and Arnold Print Works, Inc. Milton Paulson appeared as counsel for plaintiff, Samuel Thompson, and as general counsel for all plaintiffs. Other plaintiffs and defendants were also represented. (Exhibit "D", p. 3.)

17. Sometime in June or July of 1948, Bernard Armour consulted Mr. Leonard B. Frutkin, a member of the bar of the State of New York, relative to the shareholders' derivative suit instituted by Samuel Thompson. Mr. Frutkin did not appear as counsel of record in the litigation. (Tr. 251–252.) Although Mr. Frutkin did not take part in any of the negotiations leading up to the settlement he did participate in the litigation in a consultative capacity, only after the parties signed the stipulation on June 4, 1948. (Exhibit "C"; Tr. 260.) Also sometime between the stipulation of June 4, 1948, and the Referee's report, after a conversation between Mr. Frutkin and Mr. Daly, counsel of record for Mr. Armour, Mr. Frutkin started to represent the Aspinook Corporation. (Tr. 261–263.)

18. Apart from the stipulation of settlement, Bernard Armour agreed to forego bonuses for the fiscal years ending June 30, 1947 and 1948 which totalled $266,000. This was a direct result of the derivative suit and was considered by the Referee in passing on the adequacy of the settlement. (Exhibit "D", p. 6.)

19. The Referee ultimately recommended that the settlement be approved by the Court. (Exhibit "D", p. 59.)

20. The bonuses which were put in issue by the fourth cause of action in the derivative suit totalled $757,738.04. Of that amount Bernard Armour received $259,299.65. (Exhibit "D", pp. 42, 43.)

21. All of the bonuses paid by the three defendant corporations were deducted by them in computing taxable income and resulted in a tax benefit to them. (Tr. 230.)

22. Although the Referee ultimately expressed the view that the plaintiffs probably would not prevail on the bonus issue (Exhibit "D", p. 49), this view was expressed after the settlement and accordingly could not have affected the terms of the settlement.

23. The plaintiffs in the derivative suit did not indicate to the Referee that they would abandon the cause of action relating to the invalidity of the bonus plan but did indicate that the contention that the bonuses were improperly computed would be abandoned. (Exhibit "D", p. 49.)

24. In the hearings before Mr. Justice Hecht in the Supreme Court, County of New York, regarding the Referee's recommendation that the settlement be approved, Mr. Paulson, general counsel for the plaintiffs, pointed out to the court that as a result of the litigation Mr. Armour has been eliminated from participation in the revised bonus plan. (Exhibit "2", pp. 2, 3.)

25. The income tax return referred to in Finding of Fact No. 1, was prepared by Ernest J. Tacy of Scovell, Wellington & Company. Prior to preparation of the return a conference was held between Mr. Kelley and representatives

of Scovell, Wellington & Company (Exhibit "6".)

26. A memorandum dated August 9, 1949 was prepared by Mr. William W. Johnston, who attended the conference, addressed to Mr. Kumblad (a partner in the New York office of Scovell, Wellington & Company) contains the following paragraph:

9. We expect "new" Aspinook to report $259,299.65 as income, being the recovery (presumably) of prior years bonuses paid and deducted. (Exhibit "6", par. 9.)

27. Mr. Johnston was the partner in charge of the tax department of the Springfield, Massachusetts office of Scovell, Wellington & Company (Tr. 345) and the income tax return for New Aspinook for the period ending June 30, 1949 was prepared under his supervision. (Tr. 346.)

28. A second memorandum dated September 13, 1949 also addressed to Mr. Kumblad with a carbon copy to Mr. Tacy was prepared by J. Franklin Norcross who was a staff man in the tax department of Scovell, Wellington & Company working under Mr. Johnston. Mr. Norcross was responsible for reviewing the tax return for New Aspinook for the period ending June 30, 1949. (Exhibit "4"; Tr. 194, 195, 201.)

29. Paragraph 3 of this memorandum stated:

"According to Mr. Johnston's memorandum dated August 9, 1949, which gave rise to our questions, the bonuses which Mr. Armour actually received in prior years totaled $259,-299.65. The position which you wish us to take is that through the relinquishment of the shares, the new company made a recovery of the prior year's bonuses in the amount of $259,299.65, and that this sum should be included in income for the period ended June 30, 1949. The balance of the $1,785,000 is to be considered as a recovery attribut-able to the interest which he held in Lawrence and Arnold, and no effect is to be given to this on the return."

30. A letter dated January 12, 1950 from Mr. Frutkin to Mr. Swiger of Mr. Kelley's law firm, also makes reference to the fact that a part of the 102,000 shares surrendered by Mr. Armour represented a restoration of bonuses. The letter also states that "all interested parties concurred." It reads in part:

"c) We developed the view in which all other interested parties concurred after reconsideration of prior plan, that since a part of the 102,000 shares surrendered to the corporation represented restitution of bonuses, it was advisable, from the corporation's point of view, without regard to incidental benefits to Mr. Armour, in order to obviate later question and probable litigation concerning the tax treatment of the settlement, that a reasonable portion of the value of the 102,000 shares surrendered to the corporation be allocated by it to the bonus claims. As a result, approximately $250,000 was thus allocated."

31. The interested parties who concurred were Lord, Day & Lord, Swiger, Chambers and Kelley and Scovell, Wellington & Company. (Tr. 296, 297.)

32. From a consideration of all the evidence presented, it is clear that New Aspinook recovered $259,299.65 in compensation previously paid and deducted by virtue of the settlement of the stockholders' derivative suit.

33. The taxpayer has failed to sustain its burden of proving that its sworn statement of fact on its income tax for the period ending June 30, 1949 that it recovered $259,299.65 in compensation previously paid was erroneous.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter herein, pursuant to 28 U.S.C. § 1346.

2. Where a taxpayer receives a return of amounts previously expended by it which were deducted for tax purposes, the value of what is returned is subject to taxation. E. g., Rothensies v. Electric Battery Co., 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296; § 22(b) (12) of the Internal Revenue Code of 1939; 26 U.S.C.A. § 22.

3. A settlement must be characterized for tax purposes by what was actively sought by the plaintiff in the litigation settled. E. g., Lyeth v. Hoey, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119; Carter's Estate v. C. I. R., 298 F.2d 192 (8 Cir. 1962), affirming 35 T.C. 326, certiorari denied, 370 U.S. 910, 82 S.Ct. 1257; Sager Glove Corporation v. C. I. R., 36 T.C. 1173, affirmed 311 F.2d 210 (7 Cir. 1962).

4. Where a corporation receives its own stock in discharge of an obligation owed to it, the transaction is treated as if payment had been made in any other property. Treasury Regulations 111, § 29.22(a)–15; E. R. Squibb & Sons v. Helvering, 98 F.2d 69 (2 Cir. 1938), modified in part as not here applicable, 102 F.2d 681 (2 Cir. 1939); Commissioner of Internal Revenue v. S. A. Woods Mach. Co., 57 F.2d 635 (1 Cir. 1932), certiorari denied, 287 U.S. 613, 53 S.Ct. 15, 77 L.Ed. 532; Country Club Estates, Inc. v. Commissioner, 22 T.C. 1283; C. G. Meaker Co. v. Commissioner, 16 T.C. 1348; James v. Commissioner, 30 B.T.A. 491, affirmed sub nom., Peerless Inv. Co. v. Commissioner of Internal Revenue, 80 F.2d 427 (9 Cir. 1935).

5. Inasmuch as the taxpayer has recovered compensation previously paid and deducted by its predecessors, from which they derived a tax benefit, the compensation recovered by virtue of the settlement of the stockholders' derivative suit is income to the taxpayer.

6. Judgment shall be entered for the defendant, United States of America.